222 P.3d 841 (2009)
DASHIELL R., Appellant,
v.
STATE of Alaska, DEPARTMENT OF HEALTH AND SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES, Appellee.
No. S-13447.
Supreme Court of Alaska.
December 31, 2009.
*842 Anthony M. Sholty, Faulkner Banfield, P.C., Juneau, for Appellant.
Michael G. Hotchkin, Assistant Attorney General and Daniel S. Sullivan, Attorney General, Anchorage, for Appellee.
Dianne Olsen, Law Office of Dianne Olsen, Anchorage, for Guardian ad Litem Janine Reep.
Before: CARPENETI, Chief Justice, FABE, WINFREE, and CHRISTEN, Justices.

OPINION
CARPENETI, Chief Justice.

I. INTRODUCTION
Following trial, the superior court terminated an incarcerated father's parental rights. He appeals, claiming error in four of the superior court's findings: that he did not remedy the conditions causing harm to the children; that he did not make adequate provisions for the children during his incarceration; that the state made active efforts to keep the family together; and that termination is in the children's best interests. Because abundant evidence supported the superior court's findings that the conditions causing harm to the children remain unremedied and that termination of parental rights is in the children's best interests, we affirm those findings by the superior court. Our holding that the conditions causing harm to the children remain unremedied makes it unnecessary to decide whether the father made adequate provisions for his children during his incarceration. And because the superior court properly considered the efforts of both the Office of Children's Services and the Department of Corrections, we conclude that the court did not err in finding that the state made active efforts in this case. Accordingly, we affirm the superior court's decision terminating the father's parental rights.

II. FACTS AND PROCEEDINGS

A. Facts
Dashiell R. is the biological father of Jules *843 S. and Sameera R.[1] Summer S. is the biological mother of both children and has previously relinquished parental rights. Summer is of Tlingit descent, and thus the Indian Child Welfare Act (ICWA) applies to this case.[2]
Jules, now eight years old, was born in June 2001. Sameera, now four, was born in January 2005. Currently the children reside in Washington state with Dashiell's parents, the Rameros.
Dashiell is incarcerated, serving sentences for two counts of perjury, one count of solicitation to tamper with a witness in the first degree, and three counts of misconduct involving a controlled substance in the third degree. Because of an extensive criminal history involving twenty-six prior misdemeanor and two prior felony convictions,[3] he was sentenced, as a worst offender, to twelve years in jail with release at the earliest in 2013. Appeals of his current convictions are pending.
Dashiell also spent significant time in jail before his current incarceration began. Dashiell's criminal history includes several domestic assault charges. Among those, Dashiell was sentenced for domestic violence in 2001 for choking a woman he was involved with (not Summer) and again in 2003, regarding the same woman. In between those instances, he was arrested for a domestic violence assault of Summer in June of 2002. In February of 2003 Summer's caseworker reported to the police that Dashiell had beaten Summer. Although it was not demonstrated that this behavior was in front of the children, the superior court heard expert testimony that, based on this history, the children would be at risk of harm if returned to Dashiell.
The State of Alaska, Department of Health and Social Services, Office of Children's Services (OCS) and the Juneau Police Department also received several reports of harm to the children, most involving Dashiell. In March 2002 the police were called because Dashiell and Summer were arguing about who nine-month-old Jules should be with. A week later Dashiell called the police to say that Jules was placed in a closed closet in his car seat for an extended period of time while Summer was high on drugs. Another report that month alleged that Dashiell was intoxicated and verbally abusive to Summer. Later in 2002, OCS substantiated an allegation that Dashiell and Summer had minors over for parties and drinking in their home, and OCS received a report of substance abuse by both parents. The record indicates that Jules and Sameera were present during most of this behavior. For a period in 2003, Summer cared for Jules under a "safety agreement" with OCS, stipulating that she would not leave Jules in Dashiell's care.
OCS received two more reports of harm in 2004 before Dashiell was incarcerated. The first alleged that Summer left Jules with Dashiell in violation of a protective order. The second alleged that the parents locked Jules in a closet while they used cocaine, and that Summer left Jules with Dashiell, who neglected him, as evidenced by a severe diaper rash. Dashiell testified he never used cocaine with Summer and that he never locked Jules in a closet. The superior court found that the report of cocaine use and locking the child in a closet was unconfirmed, but that the allegation of neglect was confirmed.
Dashiell claimed that while not incarcerated he actively participated in raising Jules and that Jules spent most of his time with him. Jules (and eventually Sameera) visited Dashiell regularly in prison while Dashiell was incarcerated near the children, before beginning his current sentence. Dashiell also stated that he checked in with Jules's preschool teacher when he could. Early in his incarceration Dashiell became concerned with the care Summer was providing their children, and made frequent calls to OCS  so many that he claims he was disciplined by the prison for the repeated contact. In January 2006 he wrote OCS a letter detailing his *844 concerns and requesting that Jules be removed from Summer's care.
OCS received several reports of harm concerning Summer's behavior, including allegations of neglect, lack of supervision of the children, and substance abuse. OCS removed the children from Summer's care in 2006. After the removal, the children were placed in at least five foster homes, then with their maternal grandmother, and then back with Summer.
While attempting to keep the children with Summer, OCS prepared case plans for the family, listing Dashiell as a participant, but not requiring anything of him. However, OCS had phone conversations with Dashiell and he participated in reviews of the plans. Also, OCS case workers monitored the programs Dashiell received in prison, consulted with Dashiell and the prison officials, and encouraged Dashiell to take certain programs while incarcerated. Dashiell has participated in several remedial programs offered by the Department of Corrections.
OCS ultimately removed the children from their mother permanently on October 3, 2007, and placed them in foster care again. In November or December of 2007 Dashiell contacted his parents, the Rameros, and left them a voice mail about assuming care for the children. The Rameros contacted OCS, visited the children, and eventually assumed care of the children on August 8, 2008.
Once the children were with the Rameros, OCS facilitated exchanges of mail between the children and Dashiell. According to OCS this was a partial failure because the children wrote Dashiell but he did not respond.
During Dashiell's incarceration OCS also facilitated contact between Dashiell and the children in the form of telephone visits. Although the notes are incomplete, it appears that approximately seven visits occurred, the first one occurring in February 2008. Once the children were placed with the Rameros, OCS cancelled several of the monthly visits because the agency felt it necessary to have the children focus on bonding with the Rameros. For the calls that did occur, OCS hired a therapist to talk with the children after the calls. One of the calls ended with Dashiell frustrated and hanging up on the children. Other calls similarly resulted in Dashiell being frustrated or "rais[ing] his voice . . . in a demanding way." The children's responses include being "really scared," running in and out of the room, wetting their pants, and in the case of then seven-year-old Jules, sucking his thumb, talking about not wanting to live anymore, and hiding behind a bookcase.
Indeed, the children's mental states have been heavily documented in this proceeding. As of now, the children have been in seven different foster placements. They were both exposed to prenatal alcohol or drug use, and Sameera tested positive for cocaine at sixteen months. Both children are behind developmental guidelines, have "significant difficulty with self-regulation and conflict resolution and are hyper-vigilant."
Jules has been "known to hit himself in the head while complaining `I'm stupid' or `I don't do anything right.'" Both are statements his mother reportedly made to him. Psychological evaluations in January 2008 diagnosed Jules with disruptive behavior disorder; acute adjustment disorder; enuresis; "academic problems"; clinical levels of anxiety, depression, and aggression; elevated hyperactivity; and somatization. During the evaluation, Jules frequently reverted to sucking his thumb. At these evaluations, Jules's care giver (the foster parent) reported that Jules "has extreme mood swings, frustrates easily, is very anxious and sometimes hits himself." The care giver also reported that Jules sometimes states "he wishes he were dead." Jules's "meltdowns" were described thus: "[H]e'll be hitting himself, he'll be yelling things like, go ahead and kill me. . . ." Nonetheless, Jules's intellectual and academic functioning are in the average range and he performed well in language comprehension. Indeed, the care giver reported that Jules is creative and for the most part gets along with his other siblings.
A more recent psychological evaluation in January 2009 of then seven-year-old Jules concluded that he functions "more like a toddler in his self-regulation and social-emotional skills." The evaluation also noted aggressive/disruptive behaviors and poor anger control, disruption in basic bodily functions, *845 decreased ability to be aware of social and emotional cues, and delay in social-emotional skills, among other issues.
Sameera, the younger child, was also evaluated in 2008. She was diagnosed with static encephalopathy,[4] depressive disorder, severe receptive language disorder, mild gross and fine motor delays, and significant sensory processing and modulation challenges. According to the report, her intellectual ability appears normal, but she "has difficulties in verbally-based learning and in expressive/receptive language use. . . . [S]he is easily overwhelmed, confused, and frustrated. Her problem-solving and coping skills are lagging. . . and she often responds . . . with irritability, withdrawal, [and] aggression. . . ." A separate psychologist found her "emotionally volatile" and prone to "frequent tantrums." The psychologist found Sameera "quite delayed" in "social-emotional and self-regulation skills" and asserted that four-year-old Sameera "appears to be functioning more like a 18-24-month-old toddler." The psychologist noted behavior consistent with "traumatic experiences in the early very critical years of development" and possible prenatal exposure to alcohol.
Mr. Ramero, Dashiell's father, testified extensively at trial. The Rameros currently care for the children and favor having permanent custody in order to retain responsibility for the children in the event Dashiell is released. However, Mr. Ramero conceded he would care for the children even if he were not granted permanent custody. Mr. Ramero's testimony repeatedly reflected on the emotional state and progress of the children. A psychologist evaluating the children described the placement with the Rameros as a "stable . . . positive, nurturing and supportive home" for the children. The children relate to the Rameros in a "very positive, affectionate, loving" way. The superior court found the Rameros to have significant experience working with children with special needs and found the placement to have "real promise" of a stable home meeting the children's special needs while still allowing a relationship with the biological parents.

B. Proceedings
On November 22, 2006, OCS filed a Petition for Adjudication of Children in Need of Aid and for Temporary Custody. Following the adjudication hearing, Superior Court Judge Patricia A. Collins granted the petition on April 5, 2007.
In January 2008 Dashiell petitioned the court for telephone and mail communication with the children. Finding that he had "made a prima facie case that the State has failed to provide reasonable, let alone active, efforts at reasonable visitation or parent-child contact," Judge Collins directed the state to create a case plan. OCS created a plan dated September 2008. Although prior case plans had not involved Dashiell specifically, the September 8 plan concluded he had not made progress on his plan.
Even before the September 8, 2008 plan, OCS filed the petition for termination of parental rights on June 3, 2008. The superior court held a trial January 27-28, 2009, and issued its order terminating Dashiell's parental rights on February 2, 2009. The court found the children in need of aid as defined in AS 47.10.011 subsections (2), (6), (8), (9), and (10). Independently, the court also found termination of parental rights to be justified based on Dashiell's incarceration, per AS 47.10.080(o). The superior court then found that continued custody by Dashiell would likely cause the children harm; that the state had made active efforts to prevent the breakup of the family, in accord with the federal Indian Child Welfare Act; and that termination of parental rights is in the children's best interests.
Dashiell appeals.

III. STANDARD OF REVIEW
We apply the clearly erroneous standard "when reviewing the factual findings *846 supporting the termination of a parent's right to raise his or her children."[5] A finding is clearly erroneous when a review of the entire record leaves this court "`with a definite and firm conviction that the superior court has made a mistake.'"[6] In determining whether a finding is clearly erroneous, we have stated that "we view the evidence in the light most favorable to the party prevailing below."[7]
The question of whether the state has complied with ICWA's "active efforts" requirement is a mixed question of law and fact.[8] Accordingly, we review the legal issues de novo, while reviewing the factual determinations for clear error.[9]

IV. DISCUSSION
The procedures for terminating parental rights are set out in Alaska Child in Need of Aid Rule 18. Those procedures are primarily governed by Alaska statutes but also, in the case of an Indian child, include federal requirements under ICWA.[10] There are four main procedural steps.
The first step has two alternative tracks, the latter applicable when a parent is incarcerated.[11] In the typical case, the state must prove by clear and convincing evidence that the child has been subjected to conduct or conditions described in AS 47.10.011.[12] That statute enumerates twelve grounds relevant to the child's welfare, including the incarceration of a parent,[13] on which a court may find a child to be in need of aid. The state also must show that the parent has failed to remedy those conditions or conduct.[14] However, in the case of an incarcerated parent, the state may instead show (1) that the period of incarceration during the child's minority is significant given the child's age and needs, (2) that no other parent is willing and able to care for the child, and (3) that the incarcerated parent failed to make adequate provisions for the child's care.[15]
The second step is also bifurcated, here according to whether the child is Indian.[16] Generally, the state must prove by clear and convincing evidence that it made "reasonable efforts" to provide family support services designed to keep the child with his or her parents.[17] However, in the case of an Indian child, ICWA requires the state to make "active efforts" at providing remedial and rehabilitative programs to keep the family together.[18] Although Alaska statutes make an exception in some cases where the parent is incarcerated (in which case reasonable efforts are not required),[19] ICWA has no exception for incarceration, and requires active *847 efforts even when a parent is incarcerated.[20]
Third, the state must show by a preponderance of the evidence that termination of parental rights is in the best interests of the child.[21]
Fourth and finally, in the case of an Indian child, the state must prove by evidence beyond a reasonable doubt, including by expert testimony, that "continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."[22]
Dashiell appeals four of the superior court's findings. He claims that the superior court erred (1) in finding unremedied the conditions that caused harm to the children (step one above), (2) in finding he had not made adequate provisions for the children's care during his incarceration (alternate step one above), (3) in finding that the state made reasonable efforts to reunify the family (step two above), and (4) in finding termination of Dashiell's parental rights to be in the children's best interests (step three above).
Dashiell's first two points attack, respectively, the two alternate paths of CINA Rule 18's first step. As detailed above, before a court may terminate parental rights, the state must prove either that unremedied conditions harmful to the child exist or that an incarcerated parent made inadequate provisions for the child during the parent's incarceration. Because we find no merit in Dashiell's first claim, and therefore affirm the superior court's finding that the harmful conditions remain unremedied, we do not reach his second claim, that he made adequate provisions for the children. Accordingly, the following discussion addresses in turn Dashiell's three remaining claims on appeal.

A. The Superior Court Did Not Err in Finding that Dashiell Had Not Remedied the Conditions Causing Harm to the Children.
Dashiell contends the superior court erred in finding that the conditions harmful to his children were unremedied. He claims that the majority of the harmful conditions were due to the children's mother and that, for his part, he has enrolled in many remedial programs while in prison. We review the superior court's findings of fact for clear error.[23]
As Dashiell points out, the record indicates that the children's mother was responsible for many conditions harmful to the children. The record also indicates that Dashiell actively urged OCS to remove one child, Jules, from the mother's care. Similarly, the record shows that Dashiell enrolled in several programs while incarcerated.
However, these facts alone do not clearly show that the superior court erred. The superior court must consider the whole picture when deciding whether a parent has remedied the conduct or conditions posing harm to the children:
(b) In making a determination . . . the court may consider any fact relating to the best interests of the child, including
(1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs;
(2) the amount of effort by the parent to remedy the conduct or the conditions in the home;
(3) the harm caused to the child;
(4) the likelihood that the harmful conduct will continue; and
(5) the history of conduct by or conditions created by the parent.[[24]]
In the present case, Judge Collins looked at all of the relevant factors under these rules and concluded that the conduct and conditions had not been remedied. Dashiell's contentions, even if fully credited, do not establish clear error by the superior court.
*848 First, Judge Collins was aware that many of the conditions were due to the mother, but nonetheless found many important conditions were attributable to Dashiell and remained unremedied. Indeed, as a result of Dashiell's conduct, the court found the children to be in need of aid under five separate statutory subsections. The court also detailed his domestic violence history, his criminal history, his current incarceration, and the reports (both confirmed and unconfirmed) of his neglect of his children. The court then found that Dashiell had "not remedied the conditions that caused so much harm to these children and places them at such great risk of future serious physical and mental injury." This was consistent with expert testimony that the children would be at risk of harm if returned to Dashiell. Accordingly, the superior court was well aware that some conditions were the result of the children's mother, but nonetheless found Dashiell's conduct sufficient to support termination.
Second, Dashiell is simply wrong in asserting that, because he attended programs in prison, the state could not prove by clear and convincing evidence that the conditions arising from his behavior are unremedied. The court credited Dashiell with the many programs he has availed himself of while incarcerated, but stated that given the depth and breadth of his problems, they "can not be expected to be immediately cured upon release." Alaska Statute 47.10.088(b) allows the court to consider the parent's history of conduct and the likelihood that it will continue.[25] In making its findings, the court relied upon expert testimony and several empirical indicators. For example, the outcome of the phone visits between Dashiell and the children was not favorable. The children's responses to the conversations with Dashiell include being "really scared," running in and out of the room, wetting their pants, and in the case of then seven-year-old Jules, sucking his thumb, talking about not wanting to live anymore, and hiding behind a bookcase. The superior court's decision is fully supported by the evidence.
Third, and finally, it was not error for the court to base its decision in part on the fact that it was unlikely the children could be returned to Dashiell in a reasonable time. The court noted its "finding is inherent in the fact that [Dashiell] will most likely be in jail for years to come and unable to parent his children." That is a proper consideration under AS 47.10.088(b)(1)[26] and goes unaddressed by Dashiell's argument concerning his prison programs. Indeed, the court pointed out that stability and permanency is crucial to the children's health. The uncertainty regarding Dashiell's release and theoretical ability to parent is a component of the ongoing harm facing the children. Regardless of the prison programs he enrolled in, the court found that Dashiell will most likely be incarcerated for the next four to nine years  a crucial period in the children's minority. The court was concerned that the threat of impermanency and the potential return to Dashiell are themselves harmful conditions for the children's mental state. In light of these concerns noted by the superior court, its finding is not clearly erroneous.
In conclusion, the issues raised by Dashiell on appeal were explicitly addressed by the superior court. Relying on a comprehensive record, the court nonetheless found unremedied the conduct and conditions posing harm to the children. The court's finding under AS 47.10.088 is well supported by the evidence and Dashiell has not shown clear error.

B. The Superior Court Did Not Err in Finding that OCS Met Its Duty of Making Active Efforts To Reunify the Family.
Dashiell contends the superior court's finding of active efforts is clear error.[27] He *849 points to several problems with the state's efforts. First, despite Dashiell's requests, the state allegedly failed to facilitate communication between him and the children for the majority of his incarceration, at which time the state was only targeting its efforts at the children's mother. Second, OCS allegedly failed to create a case plan for Dashiell until almost two years after OCS assumed custody of the children. He further alleges that plan is a "sham" because it was created after OCS initiated proceedings to terminate parental rights. Third, Dashiell argues that the efforts OCS ultimately took were insufficient because they were not comprehensively aimed at reuniting the family, and were only undertaken half-heartedly.
The superior court's discussion of active efforts was comprised of a brief analysis and did not parse the meaning of "active efforts." The opinion noted, however, that the state's efforts were heavily oriented towards the mother, that Dashiell's incarceration impacted the efforts the state could make, and that the state made efforts at visitation and written communication, albeit imperfectly. Elsewhere in the opinion, the court noted the programs that were made available to Dashiell while he was incarcerated and in which he enrolled.
As discussed above, we review "active efforts" under ICWA as a mixed question of fact and law, reviewing the superior court's factual findings for clear error, and the legal issues de novo.[28]
Pursuant to ICWA and the second step of CINA Rule 18, the state must make "active efforts" at family reunification when Indian children are involved.[29] ICWA's precise language requires that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[30] As opposed to passive efforts such as simply developing a plan for the parent to follow, active efforts require that the state actually help the parent develop the skills required to keep custody of the children.[31] This is required even if the parent is incarcerated, although "[t]he circumstances surrounding a parent's incarceration may have a direct bearing on what active remedial efforts are possible."[32] These circumstances include the duration of the parent's incarceration and the services possible for incarcerated parents.[33] Moreover, an analysis of the state's active efforts is not limited to efforts by OCS; programs offered by the Department of Corrections are also considered part of the state's efforts.[34]
Dashiell has not demonstrated that the superior court erred in finding that the state made active efforts. Dashiell's argument, that his plan did not come about until too late, and therefore was a "sham," is unconvincing because it views the September 8, 2008, plan without considering the state's other efforts. Indeed, the superior court's discussion of active efforts never mentioned the September 2008 plan. The record before the court was replete with other state efforts, including:
 the state made undisputedly extensive efforts to keep the children with their mother during Dashiell's incarceration;

*850  the Department of Corrections offered several programs, including classes in parenting, anger management, domestic violence, and therapeutic counseling  and Dashiell indeed enrolled in them;
 OCS staff communicated with Dashiell during his incarceration regarding the children's status, and communicated with him and prison staff regarding prison programs for Dashiell; and
 OCS arranged for written exchanges and telephone visits between Dashiell and the children.
In light of this record, the superior court had a strong basis for its conclusion that the state made active efforts targeted at keeping the family together. The many programs Department of Corrections provided to Dashiell are a relevant component of the state's services.[35] Moreover, there is evidence that counselors from OCS worked with Dashiell and prison staff regularly long before the September 2008 plan came about, and, as admitted in Dashiell's briefing, Dashiell "anticipated the case plan and acted on it" well in advance.
Further, a court may take into account the limits imposed by a parent's incarceration or the length of his sentence.[36] Given that the superior court found the children were in need of stability, continuity, and safety, the court was correct, in assessing the active efforts by the state, to take into account Dashiell's sentence.
Finally, the superior court was correct to point to efforts OCS made regarding the mother. Again, the state's efforts to keep the Indian family together were more comprehensive than just the September 8, 2008, case plan. In this case, had the children been able to stay with the mother, who was not incarcerated, there is no indication Dashiell's parental rights would have been terminated, because there would have been no need for the children to be placed elsewhere. As the superior court noted  and Dashiell does not contest  the state's efforts regarding the mother were "very active." We view these efforts as an important aspect of the state's active efforts to keep the family together.
In sum, the superior court did not err in concluding that the state made active and ultimately unsuccessful efforts to reunify the family.

C. The Superior Court Did Not Err in Determining that Termination of Dashiell's Parental Rights Was in the Children's Best Interests.
Dashiell appeals as clear error the superior court's finding that termination of his parental rights was in the children's best interests.
Before terminating parental rights, a superior court must find termination to be in the child's best interests by a preponderance of the evidence.[37] We review such a finding for clear error.[38]
In a brief discussion, Judge Collins found termination of parental rights to be in the best interests of the children. The court found the Rameros to be exceptionally qualified parents, particularly with respect to children with special needs. The court then concluded that the current situation shows promise for a stable home for the duration of Jules's and Sameera's childhoods, and may even allow the children to know their biological parents. The court also noted the children's need for stability and permanency, and that continued custody by Dashiell is likely to cause serious harm to the children.
Dashiell raises two specific contentions. First, that the children will remain with the Rameros regardless of whether Dashiell's parental rights are terminated. Second, that if he is not released from jail imminently, he would not contest the Rameros' eventual adoption of the children. These arguments do not establish clear error.
Both arguments are unpersuasive because the court found the need for a permanent, *851 stable relationship now. Even though the Rameros would still care for the children if Dashiell retained parental rights, the children's future would be in flux depending on the incarceration and progress of Dashiell. And the court was extraordinarily wary of Dashiell's prospects for success. In other words, the court found that the children right now need a home where they have an ongoing sense of permanence and security, and can bond with their care giver during their formative years. The Rameros provide that environment. If the Rameros' care were only temporary and the children remain with the Rameros now, but under the cloud of continuing uncertainty, the children's need for permanence and security would not be met.
Moreover, the court specifically found that any future custody by Dashiell would risk "serious emotional or physical damage to the children." His contention that he might not take the children until later does not alter the analysis on this point.
In light of the superior court's findings, Dashiell has not shown that it was clear error to conclude that termination of Dashiell's parental rights was in the children's best interests.

V. CONCLUSION
Because the superior court properly considered the evidence in its entirety, and that evidence supported the court's finding, we AFFIRM its finding that the conditions harmful to the children remain unremedied. Accordingly, we need not reach the question whether Dashiell made adequate provisions for the children during his incarceration. Additionally, because the active efforts the state must make to keep the Indian family together are defined comprehensively, and include programs offered by both the Office of Children's Services and the Department of Corrections, we AFFIRM the superior court's conclusion that the state made active efforts to reunify the family. Finally, because there was an adequate basis in the record for the superior court's finding that that termination of parental rights is in the children's best interests, we AFFIRM the superior court on that issue. Accordingly, we AFFIRM the decision of the superior court terminating Dashiell's parental rights.
EASTAUGH, Justice, not participating.
NOTES
[1] We use pseudonyms to protect the family's privacy.
[2] 25 U.S.C. § 1912 (2006).
[3] These include burglary, domestic violence assault, violating conditions of release, drug violations, and driving while intoxicated.
[4] "Static encephalopathy is defined as `permanent or unchanging brain damage'. . . . [It] can appear as a single diagnosis, however, it is often used in conjunction with a range of disabilities.. . ." MINNESOTA LOW INCIDENCE PROJECT, STATIC ENCEPHALOPATHY http://swsc.schoolwires.net/ XXXXXXXXXXXXXXXXX/lib/XXXXXXXXXXXXXXXXX/ Static_ Encephalpathy_Fact_Sheet.pdf (last visited Nov. 25, 2009). In Sameera's case, it was associated with fetal alcohol syndrome.
[5] Frank E. v. State, Dep't of Health & Soc. Servs., Division of Family & Youth Servs., 77 P.3d 715, 717 (Alaska 2003) (quoting G.C. v. State Dep't of Health & Soc. Servs., Division of Family & Youth Servs., 67 P.3d 648, 650 (Alaska 2003)).
[6] Id.
[7] Id. (quoting In re J.L.F. & K.W.F., 828 P.2d 166, 170 n. 12 (Alaska 1992), overruled on other grounds by In re S.A., 912 P.2d 1235 (Alaska 1996)).
[8] T.F. v. State Dep't of Health & Soc. Servs., Division of Family & Youth Servs., 26 P.3d 1089, 1092 (Alaska 2001).
[9] A.A. v. State, Dep't of Family & Youth Servs., 982 P.2d 256, 259 (Alaska 1999).
[10] CINA Rule 18 (referencing requirements in AS 47.10.011, 47.10.080, and 47.10.086; and providing, in the case of Indian children, protocols that comport with the Indian Child Welfare Act, 25 U.S.C. § 1912(d) and (f), (2006)).
[11] CINA Rule 18(c)(1).
[12] Id.
[13] AS 47.10.011(2).
[14] CINA Rule 18(c)(1)(A)(i)-(ii) (comporting with AS 47.10.088(a)(2) and (b)(1)-(5)).
[15] CINA Rule 18(c)(1)(B) (referring to AS 47.10.080(o), which provides the three prong test).
[16] CINA Rule 18(c)(2).
[17] CINA Rule 18(c)(2)(A) (referring to AS 47.10.086, which defines "reasonable efforts").
[18] CINA Rule 18(c)(2)(B) (comporting with 25 U.S.C. § 1912(d) (2006)). The standard of proof provided in CINA Rule 18 is clear and convincing evidence, although preponderance of evidence appears in some case law. See, e.g., A.M. v. State [I], 891 P.2d 815, 826 (Alaska 1995), aff'd on rehearing, A.M. v. State [II], 945 P.2d 296, 305-06 (Alaska 1997).
[19] AS 47.10.086(c)(10).
[20] See 25 U.S.C. § 1912(d).
[21] CINA Rule 18(c)(3) (comporting with AS 47.10.088(c)).
[22] CINA Rule 18(c)(4) (comporting with 25 U.S.C. § 1912(f)).
[23] Frank E. v. State, Dep't of Health & Soc. Servs., Division of Family & Youth Servs., 77 P.3d 715, 717 (Alaska 2003).
[24] AS 47.10.088(b).
[25] AS 47.10.088(b)(4), (5).
[26] "[T]he likelihood of returning the child to the parent within a reasonable time based on the child's age or needs[.]" AS 47.10.088(b)(1).
[27] Although the superior court correctly analyzed the case in terms of federally mandated active efforts, counsel for Dashiell appeals in terms of reasonable efforts, citing Alaska law. The confusion is somewhat understandable, since the lower court cited to a decision concerning "reasonable" efforts under Alaska statutes, not "active" efforts under the ICWA.

However, as the state points out, "active" efforts are required in this case because the children's mother was Indian. See 25 U.S.C. § 1912(d) (2006); and CINA Rule 18(c)(2)(B). Accordingly, we review the state's efforts under that standard.
[28] See Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs., 204 P.3d 1013, 1018 (Alaska 2009); A.A. v. State, Dep't of Family & Youth Servs., 982 P.2d 256, 259 (Alaska 1999).
[29] 25 U.S.C. § 1912(d) (requiring active efforts).
[30] Id.
[31] A.M. v. State [I], 891 P.2d 815, 827 (Alaska 1995).
[32] Id. (also stating that "[n]either incarceration nor doubtful prospects for rehabilitation will relieve the State of its duty under ICWA to make active remedial efforts").
[33] Id.
[34] Frank E. v. State, Dep't of Health & Soc. Servs., Division of Family & Youth Servs., 77 P.3d 715, 720-21 (Alaska 2003); T.F. v. State, Dep't of Health & Soc. Servs., Division of Family & Youth Servs., 26 P.3d 1089, 1096 (Alaska 2001).
[35] Frank E., 77 P.3d at 720-21; T.F., 26 P.3d at 1096.
[36] A.M. [I], 891 P.2d at 827.
[37] CINA Rule 18(c)(3) (comporting with AS 47.10.088(c)).
[38] Frank E., 77 P.3d at 717.