NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| CYRA J., | ) | |
| | ) | Supreme Court No. S-16666 |
| Appellant, | ) | |
| | ) | Superior Court Nos. 3AN-15-00229/ |
| v. | ) | 00230 CN |
| | ) | |
| STATE OF ALASKA, | ) | MEMORANDUM OPINION |
| DEPARTMENT OF HEALTH & | ) | AND JUDGMENT* |
| SOCIAL SERVICES, OFFICE OF | ) | |
| CHILDREN'S SERVICES, | ) | No. 1686 – August 8, 2018 |
| | ) | |
| Appellee. | ) | |
| _____ | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Erin B. Marston, Judge.

Appearances: Leif A. Thompson, Leif Thompson Law Office, Ketchikan, for Appellant. David T. Jones, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, and Bolger, Justices. [Carney, Justice, not participating.]

## I. INTRODUCTION

Three children were taken into emergency custody by the Office of Children's Services (OCS) in March 2015. The mother failed to engage in her case plan. Less than three months before the trial on OCS's petition to terminate her parental rights,

---

\* Entered under Alaska Appellate Rule 214.

she belatedly attempted to address her alcohol problem, entering residential treatment at the Salvation Army Clitheroe Center (Clitheroe). The superior court found that her efforts were "too little, too late" and terminated her parental rights in March 2017. The mother appeals. We affirm the superior court's order.

## II.   FACTS AND PROCEEDINGS

Cyra J. is the mother of Lulu, Joey, and Barry, who were born in 2011, 2013, and 2014, respectively.[1] The children are Indian children under the Indian Child Welfare Act (ICWA).[2]

In March 2015 Cyra "responded to a Craigslist ad and brought a man into the home when the children were present[,] . . . drank heavily with the man, [and] then had sex in front of the children in an intoxicated state."[3] When Cyra woke up, four-year-old Lulu was missing her underwear and indicated that the man had molested her. Cyra contacted the police, and a protective services report was filed with OCS. OCS took emergency custody of the children.

Cyra has an extensive history with OCS. Since 2009 OCS had received 14 protective services reports against her, most of which related to neglect due to substance abuse and domestic violence involving intoxicated adults. In September 2013 Cyra reported that her brother, who was living with her family, had sexually abused Lulu; despite her allegation, Cyra continued allowing her brother to care for the children while she was at work.

---

[1]   Pseudonyms are used for all family members.

[2]   25 U.S.C. § 1903(4) (2012).

[3]   According to OCS, Cyra confirmed the incident except for disputing any sexual acts between her and the man; Cyra reported that she "put [Barry] and [Joey] in the same bed as her and [the man]" and that Lulu was in another bed next to hers.

The children were initially placed in foster homes in Anchorage, and OCS facilitated visitation at its office. Joey and Barry were placed with Jason M. in Wasilla in May 2015, with Lulu subsequently joining them. All three children consider Jason M. their father, but later paternity testing showed that Jason is not the biological father of Lulu and Joey; their father is unknown. The children's tribe "passed a tribal resolution stating that [Jason's] home is considered by the Tribe to be a family placement" and later approved Jason and his wife as the adoptive placement for Lulu and Joey.

An OCS caseworker met with Cyra in April 2015 to develop a case plan. The caseworker described Cyra as very open and honest about her struggles with substance abuse and her history of trauma. The case plan included urinalysis tests (UAs), a parenting evaluation, and a parenting program, as well as a dual-diagnosis substance abuse assessment at Akeela House Recovery Center to determine the necessary level of treatment and what mental health services were needed. Cyra also selected a behavioral health provider. However, Cyra did not engage in her case plan. She set up an initial assessment with Akeela but did not complete it because she had been drinking.

After the children's placement changed to Wasilla, OCS could no longer facilitate visitation at its office, so the caseworker submitted a referral for Cyra to participate in weekly supervised visits through Alaska Family Services (AFS) in Wasilla. OCS made bus passes available for Anchorage and offered Cyra a Valley Mover bus pass for her visitation in Wasilla, but she declined because she had her own transportation.

AFS had trouble reaching Cyra to set up visits, and she was unable to provide a schedule of her availability. The caseworker called Cyra about the scheduling issues but had to ask her to call back later because Cyra seemed to be under the influence. Because visits through AFS were not working, the caseworker personally

facilitated a couple of visits in Wasilla in the summer of 2015. In June 2015 the caseworker called about a visit Cyra failed to show up for, and Cyra explained that she did not show up because she had been drinking.

At some point the referral to AFS was closed and OCS tried phone visitation, but it was discontinued after a handful of phone calls because of issues such as Cyra calling late, making inappropriate comments to the children, and once seeming intoxicated during a call. The record shows phone visitation took place in late summer 2015 or in the winter or spring of 2016.

OCS provided another referral to AFS, and in-person visits took place. The caseworker testified that Cyra initially participated consistently in the visits. However, Cyra sometimes called to cancel because she was drinking, and she reportedly was sometimes late or did not show up. AFS closed her referral again in late November or early December 2015 due to excessive no-shows following her November DUI arrest, which had resulted in the loss of her license, job, and apartment. The caseworker was aware that AFS was closing the referral, so she called Cyra to discover what the issue was and to try to preserve family contact, but Cyra sounded intoxicated and promised to call back when sober. The caseworker testified that she was not notified of the DUI until later in 2016; Cyra testified that she told the caseworker about it a week or two after it happened, that the caseworker then asked whether she had a way to get to visits, and that she told the caseworker that a friend could drive her. Cyra testified that she showed up for visits a couple of times only to discover that they had been cancelled. This was essentially her last contact with the children, and she had "very sporadic contact with [OCS]" from that point; her caseworker had difficulty reaching her since around fall 2015 because Cyra's phone number did not always work. The caseworker testified that to maintain contact with clients, she would call last known numbers and send letters to

last known addresses, and that she had done so at least quarterly in this case and tried to do it monthly.

In January 2016 Cyra emailed her caseworker and asked for visits and a bus pass. The caseworker testified that she told Cyra a bus pass was available and asked to set up a time to meet but that OCS did not provide the bus pass to Wasilla because visits were never set up again with AFS. In early January 2016 Cyra went to Providence Hospital and to the Alaska Native Medical Center's emergency department due to alcohol withdrawal.

Apparently unbeknownst to OCS, Cyra received treatment through Four Directions Outpatient Treatment Center. Because of Cyra's June 2015 conviction of neglect for inadequate supervision under Anchorage Municipal Code 8.10.040(B)(7) (2014) (based on the March incident), the Anchorage Alcohol Safety Action Program Misdemeanor Services (AASAP) "assigned [Cyra] to Four Directions for an evaluation and follow through on 7/7/15." She participated in outpatient treatment there from September 2015 until March 2016 but continued drinking for the duration of the program. Around April 2016 Cyra told her caseworker that she was working with Four Directions and trying to get into treatment and wanted visits with her children. The caseworker scheduled a meeting with her and dropped a bus pass off for her at her sister's house; Cyra did not show up for the meeting but met with the caseworker soon thereafter. The caseworker submitted a new referral to AFS; AFS tried to reach Cyra but was unable to schedule her for visits, and the referral was closed without any family contact.

The caseworker contacted Four Directions, where a staff member verified that Cyra was attending pre-treatment groups and that Four Directions was trying to get her into Old Minto, a residential treatment program. Cyra's tribe purchased a plane ticket for Cyra to go to Old Minto, but she did not show up for her flight. When the

caseworker talked with her about it, Cyra told the caseworker that the tribe was setting up another flight for the next month; the tribe renewed the ticket, but Cyra again did not show up. Cyra later testified that she "just didn't want to go there" and that she continued drinking. In April 2016 Four Directions discharged her for noncompliance. According to the discharge summary, she reported that she had "been drinking straight for the past 10 days"; it notes that she missed a significant number of treatments, had a couple of DUIs, "could not stay sober[,] and was drinking severely." Residential treatment was recommended, possibly preceded by detox.

In February 2016 Cyra pleaded guilty to the November DUI and was again required to report to AASAP for treatment. AASAP "assigned [her] to Clitheroe Center for a treatment evaluation and to follow through with whatever education or treatment [was] recommended."[4]

In September 2016 OCS petitioned for termination of Cyra's parental rights to Lulu and Joey.[5]

In October 2016 Clitheroe recommended a residential treatment program because Cyra "had at least six failed treatment episodes, [a] history of binge drinking, and severe complications in her life due to alcohol abuse, including a long history with [OCS] and the loss of driving privileges." She began treatment at Clitheroe on November 28, less than three months before the termination trial. In November or December she called her caseworker and asked for family contact. The caseworker

---

[4] At trial Cyra was asked what events led her to go Clitheroe for treatment, and she claimed that it was "[j]ust [her] continuous use to keep drinking" and that she "knew [she] needed the help." She testified that she decided to go to Clitheroe because she "hit rock bottom" in November when she went out to drink and woke up in a tent somewhere in Anchorage.

[5] Barry had been dismissed from the OCS case in December 2015 after Jason obtained interim custody of him in a separate custody case.

denied contact; a termination trial had already been set, and the caseworker wanted the children assessed for a therapeutic recommendation because it had been a year since Cyra had seen the children.

The termination trial took place on February 14 and March 3, 2017. Cyra was still undergoing treatment at Clitheroe as of the first day of the termination trial but graduated by the last day of trial. Her substance abuse counselor from Clitheroe testified about Cyra's progress and apparent internal motivation to stay sober; the counselor testified that she believed it was important for Cyra to reunite with her children but that Cyra still needed aftercare and time to work on herself and that immediate reunification would be "a setup for failure." OCS's expert testified that she believed returning the children to Cyra would cause them harm and that "two months of substance abuse treatment is [not] sufficient"; because of the many issues that needed to be resolved, OCS's expert believed that Cyra would not be able to safely parent until "way down the road." The caseworker also testified at trial.

Cyra testified on the last day of trial and stated that she began Clitheroe aftercare two days earlier by attending an individual counseling session and two groups, which were required weekly for 12 weeks. She testified that she attended her first parenting class with Father's Journey, for a 13-week program, and would attend her first Healthy Relationships group the following week, for a 14-week program. She testified that she was on the tenth day of a commitment to attend 90 Alcoholics Anonymous meetings in 90 days and was working on step 4 of the 12-step program. She had written a goodbye letter to alcohol and a list of ten positive rituals, which included attending three Alcoholics Anonymous meetings and one Narcotics Anonymous meeting each week, working on the 12-step program with her sponsor, and doing everything in her power to have her three youngest children returned to her (including completing treatment and aftercare, getting and keeping a job, getting an apartment, and staying

sober). She testified that she was not yet ready to have her children returned to her but wanted to see them and was working toward being able to have them back.

The superior court found that Lulu and Joey were children in need of aid under AS 47.10.011(1) (abandonment), (6) (physical harm), (7) (sexual abuse), and (10) (substance abuse).[6] The court found that Cyra failed to remedy the conduct or conditions that placed the children at substantial risk of harm,[7] that active but unsuccessful efforts had been made to prevent the breakup of the Indian family and enable the safe return of the children to Cyra,[8] that continued custody of the children by Cyra would likely result in serious emotional or physical harm to them,[9] and that terminating Cyra's parental rights was in the best interests of the children.[10] The court terminated Cyra's parental rights to Lulu and Joey on March 7, 2017.

Cyra appeals.

## III. STANDARD OF REVIEW

When terminating parental rights in ICWA cases, the superior court must find by clear and convincing evidence "that the parent has not remedied, or has not remedied within a reasonable time, the conduct or conditions in the home that place the child at substantial risk of physical or mental injury" and "that active but unsuccessful efforts have been made to provide remedial services and rehabilitative programs

---

[6] AS 47.10.088(a)(1); CINA Rule 18(c)(1)(A).

[7] AS 47.10.088(a)(2); CINA Rule 18(c)(1)(A).

[8] 25 U.S.C. § 1912(d) (2012); CINA Rule 18(c)(2)(B).

[9] 25 U.S.C. § 1912(f); CINA Rule 18(c)(4).

[10] AS 47.10.088(c); CINA Rule 18(c)(3).

designed to prevent the breakup of the Indian family."[11]  The court must "find, 'by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child.' "[12]  And the "court must determine by a preponderance of the evidence that 'termination of parental rights is in the best interests of the child.' "[13]

Whether the parent has remedied the conduct or conditions that placed the child at substantial risk of harm, whether continued custody of the child by the parent is likely to result in the child suffering serious emotional or physical damage, and whether termination of parental rights is in the best interests of the child are factual findings, which are reviewed for clear error.[14]  "Factual findings are clearly erroneous if review of the entire record leaves us with 'a definite and firm conviction that a mistake has been made.' "[15]  "Conflicting evidence is generally insufficient to overturn the superior court, and we will not reweigh the evidence when the record provides clear support for the

---

[11]     *Chloe W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 336 P.3d 1258, 1264 (Alaska 2014) (first citing AS 47.10.088(a)(2); then citing CINA Rule 18(c)(1)(A); then citing 25 U.S.C. § 1912(d); and then citing CINA Rule 18(c)(2)(B)).

[12]     *Id.* (alteration in original) (quoting 25 U.S.C. § 1912(f)) (citing CINA Rule 18(c)(4)).

[13]     *Id.* (quoting CINA Rule 18(c)(3)) (citing AS 47.10.088(c)).

[14]     *Shirley M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 342 P.3d 1233, 1239-40 (Alaska 2015); *Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 962 (Alaska 2013).

[15]     *Chloe W.*, 336 P.3d at 1264 (quoting *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 427-28 (Alaska 2012)).

superior court's ruling."[16]  Whether active efforts have been made as required by ICWA is a mixed question of law and fact.[17]  Questions of law are reviewed de novo.[18]

## IV.    DISCUSSION

### A.    Failure To Remedy

Under AS 47.10.088(a)(2) termination of parental rights requires a finding by clear and convincing evidence that the parent "has not remedied the conduct or conditions in the home that place the child at substantial risk of harm" or that the parent "has failed, within a reasonable time, to remedy the conduct or conditions," so the child would be "at substantial risk of physical or mental injury" if returned to the parent.  Here, the superior court found that Cyra failed to remedy the conduct or conditions placing her children at substantial risk of harm due to her "substantial lack of compliance," "resistan[ce] to the remedial actions," and "fail[ure] to comply with the case plan."  The court found that "nobody was able to get into contact with her on a regular basis" and that she did not "have consistent contact with OCS or with her own children."  It also noted that "[Cyra] herself in her testimony admitted that she cannot take the children at this point; she is not ready."

Cyra argues that the court's finding that she "did not participate in substance abuse treatment programs when given the opportunity" is incorrect because she completed the Clitheroe program.  She also argues that generally parental rights of parents with substance abuse issues "are terminated when the parent doesn't complete

---

**16**    *Payton S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 349 P.3d 162, 167 (Alaska 2015) (quoting *Maisy W. v.  State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008)).

**17**    *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1104 (Alaska 2011).

**18**    *Chloe W.*, 336 P.3d at 1264.

rehab or relapses in drinking," that her situation differed from such cases, and that the court therefore clearly erred in finding that she failed to remedy the conduct or conditions that placed her children at substantial risk of harm.

Contrary to Cyra's contention, the court did not overlook the fact that Cyra completed the Clitheroe program. The court found that there was "clear evidence that the conditions ha[d] not been remedied, despite the fact that she ha[d] done a two-month program at Clitheroe." And the record supports the finding that she "did not participate in substance abuse treatment programs when given the opportunity." For example, she was referred for a dual-diagnosis substance abuse assessment at Akeela but did not show up for her appointment because she had been drinking. And "she just failed to show" for her residential treatment program at Old Minto even though her admission was set up multiple times and "she was even provided a [plane] ticket."

As to Cyra's argument about rehab and relapses, the court noted that there was "evidence that [Cyra] had six prior attempts at treatment programs and ha[d] relapsed after each one" and that her counselor at Clitheroe "admitted that [Cyra] may still relapse even after this most recent treatment," which she completed shortly before the last day of the termination trial. She still had as much as 12 weeks of aftercare to complete, which she had begun two days before the last day of trial. OCS's expert witness testified that "there is definitely a concern in terms of the possibility of a . . . relapse" due to Cyra's "extensive treatment attempts and relapses, even during — while in treatment" and that it would likely take "quite a period of time" for Cyra to "internalize the treatment that she received." She testified that full recovery would take "quite a while, and not just a two-and-a-half months of treatment, but perhaps years."

Furthermore, testimony at trial shows that Cyra was not ready to be reunited with the children on March 3, 2017, nearly two years after the children were taken into OCS custody. Cyra herself testified that she was not ready to have her children back.

-11- *1686*

Her attorney stated during closing argument that Cyra was "not contesting that at this time she's not able to parent, because she is going through this process of getting herself ready." Her counselor at Clitheroe testified that Cyra still needed aftercare and that immediate reunification with her children would be "a setup for failure." And OCS's expert testified that "at this point in time," she believed that returning the children to Cyra would cause them harm. In light of this evidence, the superior court did not clearly err in finding that Cyra failed to timely remedy the conduct or conditions that placed her children at substantial risk of harm.

## B. Active Efforts

In ICWA cases parental rights may be terminated only if the court is satisfied "that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[19] Efforts are active when OCS "helps the parents develop the resources necessary to satisfy their case plans" but "passive when it requires the parents to perform these tasks on their own."[20] In addition to efforts by OCS, "the court may consider services provided by other state entities."[21] Furthermore, "[a] parent's demonstrated lack of willingness to participate in treatment may be considered in determining whether . . . active efforts" have been made.[22] The superior

---

[19]     25 U.S.C. § 1912(d); CINA Rule 18(c)(2)(B).

[20]     *Denny M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 365 P.3d 345, 350 (Alaska 2016) (quoting *Sylvia L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 343 P.3d 425, 432 (Alaska 2015)).

[21]     *Id.* (citing *Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 222 P.3d 841, 849 (Alaska 2009)).

[22]     *Id.* at 349 (quoting *Sylvia L.*, 343 P.3d at 432); *see Ben M. v. State, Dep't of*
(continued...)

court found that OCS had made active efforts but that Cyra failed to participate in the case plan, did not attend regular visits with her children, and refused mental health services.

Cyra argues that OCS made only passive efforts to prevent the breakup of her family. She argues that OCS "referred [her] to a long list of classes, and allowed her to drive to Wasilla for weekly visits with the children, but gave her no help in implementing that plan," and that "OCS did not provide enough assistance for [her] to maintain meaningful contact with her children."

The superior court found that the caseworker "did extensive case plans, . . . including family contact plans, . . . all designed to assist [Cyra] actively in resolving the substance abuse and the neglect that brought her children into state custody." Only the first case plan was created with Cyra's involvement because Cyra did not show up for later case planning meetings, but the caseworker created or updated later case plans, so a current case plan would be in place for Cyra if she re-engaged in services. The caseworker arranged for random UAs and referred Cyra for a parenting program at Father's Journey and a dual-diagnosis substance abuse assessment at Akeela.

---

**22** (...continued)
*Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1021 (Alaska 2009) ("Where services have been provided and a parent has demonstrated a lack of willingness to participate or take any steps to improve, this court has excused minor failures by the state and rejected arguments that the state could possibly have done more.").

Cyra, however, did not engage in the case plan,[23] and "nobody was able to get into contact with her on a regular basis, including the OCS worker and [AFS]." She set up an initial assessment with Akeela but missed it because she had been drinking; although the caseworker encouraged her to reschedule,[24] Cyra never completed treatment at Akeela. OCS made bus passes available throughout the case, and around April 2016 the caseworker personally dropped off a bus pass, so Cyra could go to a meeting with the caseworker that Cyra then did not show up for.

The caseworker referred Cyra to AFS several times for visits with her children. At first, AFS had trouble reaching Cyra to set up visits, so the caseworker personally facilitated a couple of visits in the summer of 2015, driving from her office in Anchorage to Wasilla to transport the children and supervise the visits. At some point OCS provided phone visitation, but it was discontinued after only a handful of phone calls because of issues such as Cyra calling late, making inappropriate comments to the children, and once seeming intoxicated during a call. The caseworker offered Cyra a Valley Mover bus pass for her in-person visits through AFS in Wasilla, but she declined because she had her own transportation. The superior court found that the visits "were unsuccessful because [Cyra] failed to attend." According to the caseworker, Cyra participated consistently in the visits initially, but Cyra testified that she sometimes called

---

[23]    *See Ben M.*, 204 P.3d at 1021-22 (holding that "the court's finding that [the father] demonstrated a general lack of willingness to participate [in OCS's efforts] is not clear error, and there was no reason to believe that additional efforts would have made a difference" where OCS set up visitation, discussed case plans with the parents, provided referrals to assessments and classes and a housing program, and attempted to maintain contact with the father and arrange visitation, but the father disappeared for months at a time and did not follow up with services or show up for many of the UAs).

[24]    The caseworker testified that she could not schedule the assessment for Cyra because Cyra "ha[d] to tell them what her schedule [was]."

to cancel visits because she was drinking, and in November 2015 the referral to AFS was closed after Cyra committed a DUI and then missed several visits.[25]

Other active efforts include treatment Cyra was required by AASAP to undergo due to her convictions for neglect and DUI.[26] She participated in outpatient treatment through Four Directions from September 2015 until March 2016 but continued drinking for the duration of the program. Around April 2016 Cyra told her caseworker that she was working with Four Directions, was trying to get into treatment, and wanted visits with her children. The caseworker submitted a new referral to AFS; AFS tried to reach Cyra but was unable to schedule her for visits, and the referral was closed. Four Directions arranged for Cyra to participate in residential treatment at Old Minto, and her tribe purchased a plane ticket so she could go, but she did not show up for her flight. This happened twice. She testified at trial that she "just didn't want to go [to Old Minto]" and continued drinking. In April 2016 Four Directions discharged her for noncompliance. She received residential treatment at Clitheroe during the last few months before her termination trial.

The superior court's underlying factual findings are not clearly erroneous, and in light of those findings and the record, we agree with the superior court's finding that active but unsuccessful efforts were made in this case.

---

[25] On appeal, Cyra argues that she "did not have the resources to drive to Wasilla after her DUI charge in November 2015" and "may have asked OCS for a bus pass to Wasilla" after losing her transportation but did not receive one. However, Cyra testified at trial that the caseworker asked whether she had a way to get to her visits after the DUI and that she told the caseworker she had a friend who could drive her. It appears that Cyra did not request a bus pass to Wasilla after her DUI until January 2016; the caseworker testified that no bus pass was provided "because family contact was never set up again with [AFS]."

[26] *See Denny M.*, 365 P.3d at 350 (citing *Dashiell R.*, 222 P.3d at 849).

## C.    Likelihood Of Future Harm

In ICWA cases parental rights may not be terminated "in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of a qualified expert witness, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child."[27]   The superior court found that continued custody by Cyra was "likely to result in serious emotional or physical damage to the child[ren]" and that "returning the child[ren] to [Cyra] would lead to a disturbing life."

Cyra argues that there is reasonable doubt whether returning her children to her is likely to result in serious emotional or physical damage to the children in light of her internal motivation to stay sober and her "unprecedented success with her treatment."  She does not challenge the qualifications of the expert witness.[28]

Although Cyra cites testimony by her counselor at Clitheroe that Cyra "appear[ed] . . . to be internally motivated to stay sober," the counselor also testified that Cyra still needed aftercare and time to work on herself and that immediate reunification would be "a setup for failure."   When asked about Cyra's chance of success after completing the Clitheroe program, the counselor explained that "the proof will come when — when she's hitting the ground and things — and life is not going right and — and all the wreckage of her past is looking at her in the face" and that "being able to do

---

[27]    25 U.S.C. § 1912(f) (2012); CINA Rule 18(c)(4).

[28]    Cyra states in her reply brief that the expert "had not worked personally with Cyra, . . . had only prepared her report from other materials in Cyra's record, . . . [and] had not consulted [Cyra's counselor at Clitheroe] prior to preparing her report."  To the extent that these statements may be construed as challenging the basis for the expert's testimony, any such challenge has been waived. *Alyeska Pipeline Serv. Co. v. State*, 288 P.3d 736, 743 (Alaska 2012) ("Arguments are waived on appeal if they are . . . raised for the first time in a reply brief.").

life and do treatment at the same time is . . . what's going to tell it all." The superior court also cited expert testimony "that [Cyra] has an extensive history of drinking from age 13, [has] an extensive history of treatment attempts including relapses while in treatment, has mental health concerns and childhood trauma, [and] has committed acts of violence and sexual acts in front of her children." And it noted the 14 protective services reports OCS had received about Cyra since 2009 and cited the expert's testimony that returning the children to Cyra at that point would cause them harm. In light of Cyra's extensive history of treatment attempts and relapses as well as the testimony about the danger of returning the children to Cyra, the superior court did not clearly err in finding based on evidence beyond a reasonable doubt that continued custody of the children by Cyra was likely to cause them serious emotional or physical damage.

### D. Best Interests Of The Children

Under CINA Rule 18(c)(3) termination of parental rights requires a finding "by a preponderance of the evidence that [it] is in the best interests of the child."[29] The superior court found that it was in the children's best interests to terminate Cyra's parental rights.

Cyra argues that the superior court clearly erred in finding that terminating her parental rights was in the children's best interests "because it did not adequately consider [certain] factors." She argues that her contact with the children "was generally appropriate" and that her "inconsistent visitation was not entirely her fault, but was a predictable result of OCS removing the children to a different city[] and not actively facilitating her visits with them." She also indicates that "[a]ll of the problems that led to [her] children being removed from her custody were largely related to drinking" and

---

[29] *See* AS 47.10.088(c).

argues that she "had completed long[-]term treatment" and was sober and that her counselor at Clitheroe "believed she was going to maintain sobriety."

Cyra's contention that "[a]ll of the problems that led to [her] children being removed from her custody were largely related to drinking" is accurate, but the superior court found that her completion of the "two-month Clitheroe program" was a "too little, too late attempt to resolve her substance abuse." And while her counselor at Clitheroe testified that Cyra "appear[ed] to be . . . internally motivated to stay sober," the counselor also acknowledged that some people still relapse after completing the Clitheroe program and being set up with aftercare and that Cyra had six previous failed treatment attempts. The counselor testified that she believed Cyra would "do very well" but that Cyra needed aftercare and that immediate reunification with her children would be "a setup for failure."

By the time of the termination trial, the children had been in OCS custody for nearly two years. Cyra was not ready to be reunited with them and had not had any contact with them for over a year. The court found that she had "been too inconsistent of a parent" and that the children needed permanency and "simply [could not] wait" any longer. It found that the children had "bonded with the foster parents[] and [that] the foster parents are wonderful people who can take care of the children's special needs." According to OCS, the foster father is the "psychological father" of Lulu and Joey, as well as the biological father and custodial parent of their younger half-brother, Barry. OCS reports that the foster parents "are willing to adopt the children and wish to be their permanent placement" and that the children's tribe "has approved [the foster parents] as the adoptive placement." The court found that "[t]he current placement would enhance the children's lives, while returning the child[ren] to the mother would lead to a disturbing life," and that "termination [was] in the best interest of these children." The superior court did not clearly err in so finding.

## V. CONCLUSION

We AFFIRM the superior court's order terminating Cyra's parental rights to Lulu and Joey.