NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

DIRK H., )
)
            Appellant, )
)
    v. )
)
STATE OF ALASKA, )
DEPARTMENT OF HEALTH & )
SOCIAL SERVICES, OFFICE OF )
CHILDREN'S SERVICES, )
)
            Appellee. )
)

Supreme Court No. S-15606

Superior Court Nos. 3AN-12-00022 CN

MEMORANDUM OPINION
AND JUDGMENT[*]

No. 1534 – March 25, 2015

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, John Suddock, Judge.

Appearances: D. Victor Kester, Anchorage, for Appellant. Jennifer A. Currie, Senior Assistant Attorney General, Anchorage, and Craig W. Richards, Attorney General, Juneau, for Appellee. Anita L. Alves, Assistant Public Advocate, and Richard Allen, Public Advocate, Anchorage, for Guardian ad litem.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

---

[*]      Entered under Alaska Appellate Rule 214.

## I. INTRODUCTION

A father appeals the termination of his parental rights to his Indian son,[1] arguing that the trial court erred by finding that: (1) he failed to timely remedy the conduct that placed the child at risk; (2) the Office of Children's Services (OCS) made the required efforts towards reunification; and (3) terminating his parental rights was in the child's best interests. We conclude that these findings are supported by the record, and we affirm.

## II. FACTS AND PROCEEDINGS

Darren was born in 2011[2] and taken into OCS custody a few months later. He was initially taken into OCS custody when his father, Dirk, was arrested and his mother could not care for him due to intoxication. Both parents have a history of alcohol abuse. OCS ultimately filed a petition to terminate both parents' rights to Darren pursuant to the Child in Need of Aid[3] (CINA) statute and the Indian Child Welfare Act[4] (ICWA), alleging that the parents subjected Darren to conduct or conditions described in AS 47.10.011(1), (2), (6), (8), (9), and (10).[5] A termination trial began in December 2013, was continued for a few months, and ended in May 2014.[6]

---

[1] Darren's mother is enrolled in the Native Village of Gambell, which has intervened pursuant to 25 U.S.C. § 1911(c) (2012).

[2] Pseudonyms are used throughout to protect the family's privacy.

[3] *See* AS 47.10.088.

[4] *See* 25 U.S.C. § 1912(f).

[5] These conditions include the child's abandonment, neglect, or risk of mental and physical harm; incarceration of a parent; or substance abuse by a parent. *See* AS 47.10.011(1), (2), (6), (8), (9), and (10).

[6] The mother voluntarily relinquished her parental rights before trial.

Darren's foster mother testified at trial that she has cared for Darren since he was about five months old. Darren has special needs because of several medical conditions, including cerebral palsy and abnormal brain function. Since early on he has been receiving services including physical, neurological, and mental evaluations; psychiatric care; and regularly scheduled physical and occupational therapy. Darren's trouble with reasoning and anger causes him to get upset, hit himself, throw things, and bite other people. His disability may cause him to ignore warnings and run into the street, and he puts non-food items in his mouth. He is a sensory seeker, meaning that he needs a high level of stimulation to comfort himself. He needs extremely consistent parenting.

Darren's foster mother expressed concern that, if other people cared for Darren, they would have difficulty managing him and he might get hurt. The foster mother testified that she and her husband wish to adopt Darren, but they would continue to facilitate and maintain contact with his biological family.

OCS presented the testimony of Stephanie Claiborne, an OCS caseworker in the Alaska Native Family Services Unit. Claiborne received the case in early 2012 and met with the parents to develop a case plan. The first case plan set out the behavior changes necessary for Dirk to be a safe parent, including substance abuse treatment and probation compliance. Claiborne referred Dirk to a substance abuse treatment facility. At that time, Dirk was also required by his probation officer to comply with a urinalysis (UA) program.

Dirk initially complied with the case plan, and OCS contemplated a trial home visit. But Dirk was discharged from substance abuse treatment and incarcerated for a probation violation when he tested positive for cocaine. After Dirk was arrested for another probation violation in the spring of 2013, he chose to serve several months jail time to avoid probation supervision after his release.

-3- *1534*

After Dirk was released from incarceration in the fall of 2013, he met with Claiborne several times during his weekly visits with Darren. Dirk's visits with Darren were inconsistent; sometimes he failed to show up or call. Claiborne had difficulty reaching Dirk, and his voice-mail was usually full. Claiborne left a message with Dirk's mother that it was very important that he call to discuss his case plan and engage in services.

Dirk had some success at treatment. Although he was discharged from one substance abuse program without completing the program, he did complete intensive outpatient treatment. Dirk's aftercare recommendations included attending Alcoholic's Anonymous or Narcotic's Anonymous meetings, establishing community support, and submitting to UA testing. Dirk was eligible for bus passes from OCS to assist with transportation for this testing. But he provided only two UA samples and failed to appear for the rest of his scheduled tests.

Claiborne started the process to place Darren with Dirk's mother in Mississippi but stopped when Dirk suggested his mother could not care for Darren. Dirk later changed his mind and Claiborne began the process again, but at the time of trial she had not yet obtained approval from the State of Mississippi.

OCS obtained a Social Security waiver for Darren, referred him to a psychiatrist, and provided his physical and occupational therapy. OCS also provided family contact services and made arrangements for Darren to visit Dirk in jail.

Neither of Dirk's case plans specifically included referrals for training regarding the parenting skills required for Darren's special needs. Although Dirk was referred to Fathers' Journeys at Cook Inlet Tribal Council, which would have trained him to work with Darren, Fathers' Journeys had difficulty reaching Dirk. In January 2014, after the termination trial began, the parties requested that the court continue further proceedings to allow OCS to revise the case plan. Counsel for OCS stated that it was

clear there were some things OCS wanted Dirk to do, that it sounded like he was willing to do them, and that OCS was mindful of the court's concerns that the case plan lacked specificity as to OCS's expectations of Dirk.

The parties and the court discussed what was expected of Dirk during the trial's intermission. Dirk agreed to attend a class beginning that night to learn about fetal alcohol spectrum disorder. OCS agreed to provide Dirk with Claiborne's direct phone number, and Dirk agreed to provide OCS with a working phone number with voice-mail, an email address, and the hotel and room number where he was residing. Dirk also agreed to attend a parenting education class weekly and to submit UA tests three times a week. Dirk was to visit with Darren alone once a week to demonstrate appropriate parenting skills. OCS agreed to meet with Darren's service providers to figure out how to incorporate Dirk into the sessions.

The court reconvened in March, and OCS indicated that Dirk had not followed through with the new case plan's requirements. Trial recommenced in May. Claiborne testified that during the trial hiatus Dirk had participated in fetal alcohol spectrum disorder class, but he did not complete the training. Dirk was also actively participating in the parenting class but had not yet completed the program when trial resumed. Claiborne had left Dirk messages and sent him emails but got no response. Dirk had not provided the required UA samples. In Claiborne's opinion Dirk had not engaged in sufficient services or gained sufficient knowledge to safely parent Darren. Meanwhile Darren was doing very well in foster care.

The manager of Fathers' Journeys testified for Dirk. At the time of trial, Dirk had attended 7 of the 13 classes in responsible parenting and 7 of the 12 classes in healthy relationships. Dirk had been checking in with the program weekly, but his other case plan requirements conflicted with attending classes. The manager testified that Dirk had made some positive changes.

OCS presented Jaime Muhr as an expert in social work. Muhr works for OCS as an Alaska Native Family Services Supervisor. She worked with Claiborne in developing Dirk's most recent case plan. Muhr said she was concerned about Dirk's parenting because he had not attended classes for the care of children with special needs, did not understand Darren's special needs, and had not developed the necessary parenting skills or practiced them during visitation. She was also concerned about Dirk's lack of communication and his failure to show up for UA testing and other appointments.

Muhr testified that the most recent case plan was specifically designed to address the areas of most concern. Muhr said that if Dirk had communicated with OCS and received the education he needed, then OCS could have begun unsupervised visits with a goal of reunification. Though she had no evidence that Dirk had relapsed into substance abuse, Muhr opined that his unwillingness to submit UA samples raised a red flag; she said parents who have stopped using drugs or alcohol were typically proud to demonstrate their sobriety through UAs.

Muhr testified that because of Darren's special needs, placing him with his father would require "a very, very long, slow, intensive transition over time with the involvement of [Darren's] therapists." Muhr testified that Dirk "does not have a relationship with those therapists or the knowledge and information about how to create and start that transition." Muhr stated that any change to Darren's placement would be devastating and that he likely would suffer serious emotional or physical damage if placed with Dirk.

At the conclusion of the trial, the court made findings on each of the elements required by statute. The trial court found that Darren was subjected to conduct that made him a child in need of aid (the parents' substance abuse and domestic violence), that Dirk failed to remedy that conduct within a reasonable time (as evidenced by his vulnerability to relapse and failure to adequately document sobriety), and that Dirk

having custody of Darren would result in serious damage to him, particularly because of his special needs.

The court also found that OCS had made active efforts toward reunification, stating:

> It's the kind of hard situation where you have somebody who makes himself unavailable, most profoundly during the six months [he] went to jail, but at most other times [he was] functionally unavailable to OCS.

The court finally concluded that it was in Darren's best interests for Dirk's parental rights to be terminated so that Darren could continue to live with his foster family.

The trial court later issued written findings, conclusions, and an order terminating Dirk's parental rights, consistent with the oral findings it made following the trial. Dirk challenges the trial court's findings that he failed to timely remedy his conduct, that OCS provided active efforts to prevent the breakup of the family, and that termination of his parental rights was in Darren's best interests.

## III.  STANDARD OF REVIEW

In CINA cases, we review a trial court's factual findings for clear error and questions of law de novo.[7] "Factual findings are clearly erroneous if, after a review of the entire record in the light most favorable to the prevailing party, we are left with a definite and firm conviction that a mistake has been made."[8]

---

[7]  *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 427-28 (Alaska 2012) (citations omitted).

[8]  *Shirley M. v State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, ___ P.3d ___, Op. No. 6979 at 11, 2015 WL 122378 at *6 (Alaska Jan. 9, 2015) (citation and internal quotation marks omitted).

## IV.  DISCUSSION

### A.  The Trial Court Did Not Clearly Err In Finding That Dirk Failed To Remedy The Conduct That Placed Darren At Substantial Risk Of Harm.

Before terminating parental rights, the trial court must find by clear and convincing evidence that the parent has not remedied in a timely fashion the conduct or conditions in the home that place the child at substantial risk of harm.[9]  In making this determination the court may take into account any fact relating to the child's best interests, including:

> (1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs;
>
> (2) the amount of effort by the parent to remedy the conduct or the conditions in the home;
>
> (3) the harm caused to the child;
>
> (4) the likelihood that the harmful conduct will continue; and
>
> (5) the history of conduct by or conditions created by the parent.[10]

Whether a parent's conduct has been remedied is a factual finding.[11]

Dirk argues that he remedied his conduct by completing substance abuse treatment, engaging in UA testing, attending parenting and life skills training, resolving his legal issues, and beginning to learn how to meet his son's special needs.  Dirk argues

---

[9]  AS 47.10.088(a)(2).

[10]  AS 47.10.088(b).

[11]  *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 270 (Alaska 2011).

that he tried to comply with the UA testing provided in the first case plan, but OCS erroneously relied upon his probation officer's representations and thus lacked an accurate or complete basis for determining that he was non-compliant.

We conclude that Dirk's failure to comply with either case plan and his inability to communicate with OCS during the trial's hiatus demonstrate that he has not sufficiently remedied his conduct to justify uprooting Darren or delaying Darren's permanency. The trial court properly considered Darren's age and the number of years he had been in foster care to determine that there was no more time for Dirk to remedy his conduct.

There was testimony to support the trial court's finding that Dirk failed to submit to UAs after his probation and during the trial's intermission, and that he failed to communicate with OCS sufficiently to prove he had remedied his substance abuse. Dirk's argument therefore lacks merit.

**B.    The Trial Court Did Not Clearly Err In Finding That OCS Made Active But Unsuccessful Efforts To Prevent The Breakup Of An Indian Family.**

In CINA cases OCS must make "timely, reasonable efforts to provide family support services to the child and to the parents . . . that are designed to prevent out-of-home placement of the child or to enable the safe return of the child to the family home, when appropriate, if the child is in an out-of-home placement."[12] In an ICWA

---

[12]    AS 47.10.086(a). OCS is statutorily required to:

(1) identify family support services that will assist the parent or guardian in remedying the conduct or conditions in the home that made the child a child in need of aid;

(2) actively offer the parent or guardian, and refer the parent or guardianto, the services identified under (1) of this

(continued...)

case, OCS must demonstrate that it made active but unsuccessful efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family.[13] "[T]he active efforts requirement of ICWA is more demanding than the reasonable efforts requirement of AS 47.10.086."[14] "As opposed to passive efforts such as simply developing a plan for the parent to follow, active efforts require that the state actually help the parent develop the skills required to keep custody of the children."[15]

Whether OCS has made active efforts is a mixed question of law and fact.[16] On review we consider OCS's involvement in its entirety in assessing whether it has met its active efforts burden.[17] OCS's efforts do not need to be perfect to be legally

---

[12](...continued)

> subsection; the department shall refer the parent or guardian to community-based family support services whenever community-based services are available and desired by the parent or guardian; and

> (3) document the department's actions that are taken under (1) and (2) of this subsection.

[13]    25 U.S.C. § 1912(d) (2012).

[14]    *Kyle S. v. State, Dep't of Health & Soc. Servs.*, 309 P.3d 1262, 1268 (Alaska 2013) (alteration in original) (quoting *Winston J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 134 P.3d 343, 347 n.18 (Alaska 2006)) (internal quotation marks omitted).

[15]    *Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 222 P.3d 841, 849 (Alaska 2009).

[16]    *Id.* at 846.

[17]    *Chloe W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 336 P.3d 1258, 1269 (Alaska 2014).

sufficient.[18] "The parent's willingness to cooperate is relevant to determining whether [OCS] has met its active efforts burden,"[19] as is the parent's incarceration.[20]

Dirk argues that he was set up to fail because the first case plan did not adequately address his son's special needs, and that the second case plan provided too many services for him to complete in a short period of time, given his obligation to work and maintain a home environment. Dirk asserts that he might have been successful if OCS had implemented a more comprehensive, reasonable plan within a proper time frame.[21] OCS responds that Dirk's repeated incarcerations, lack of cooperation, and failure to communicate hindered efforts to reunify him with Darren. OCS also argues that its case plan was appropriate given the many issues that had to be addressed.

The record supports OCS's argument. OCS initially referred Dirk for substance abuse assessments and treatment and tried to work with Dirk during his incarceration. OCS later offered Dirk the opportunity to take classes to help educate Dirk about Darren's special needs, and chances to demonstrate that Dirk's conduct was

---

[18]     *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 272 (Alaska 2011).

[19]     *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 763 (Alaska 2009).

[20]     *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999) (noting that parent's incarceration was a significant factor in the court's evaluation of the adequacy of OCS's efforts).

[21]     Dirk argues that OCS's efforts were unsatisfactory because the department did not thoroughly explore adoption by a family member. We agree with OCS that in this case adoptive placement issues are irrelevant to whether OCS met its obligation to make active efforts. *Cf. Josh L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 276 P.3d 457, 464-66 (Alaska 2012) ("OCS was not required to actively pursue placement with Josh's relatives as part of its active efforts to prevent the termination of Josh's parental rights.").

improving — most notably through communication with OCS and regular UAs. Even if OCS had begun the education component of the case plan earlier in the process, there is no evidence that these efforts would have been productive. And even when Dirk was provided another opportunity when the trial was continued, he missed most of his UA appointments, missed fetal alcohol and parenting classes, and failed to communicate with OCS as promised. We conclude that the record supports the trial court's finding.

C.    **The Trial Court Did Not Clearly Err In Finding That Termination Of Dirk's Parental Rights Was In Darren's Best Interests.**

Before terminating parental rights to a child, the trial court must find by a preponderance of evidence that termination is in the child's best interests.[22] In this case, the trial court found that it was in Darren's best interests that Dirk's parental rights be terminated, so that Darren could continue to live with his foster family. Dirk argues that he loves and cares for Darren and that a bond exists between the two, such that termination was not in Darren's best interests.

The trial court made several subsidiary findings that are relevant to its ultimate finding that termination was in Darren's best interests. At the end of the termination trial, Darren was almost three years old, and "all he knows is the [foster family]." Darren has an extraordinary need for care because of his physical and mental disabilities. Dirk has been struggling with substance abuse and domestic violence, has not demonstrated his sobriety to OCS or the court, and is at high risk for relapse. Dirk has not participated in learning what it means to care for Darren on a daily basis. It would be years before Dirk might be in a position to have the material, emotional, mental, and training resources to care for Darren, and given how much time has passed

---

[22]    CINA Rule 18(c)(3); *see also* AS 47.10.088(c).

it would be inconceivably dangerous to interrupt the healthy bond between Darren and his foster family.

The record supports these findings; therefore, there was no clear error in the trial court's ultimate finding that termination was in Darren's best interests.

## V.     CONCLUSION

We AFFIRM the trial court's order terminating Dirk's parental rights.