*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| KYLE S., | ) | |
| | ) | Supreme Court No. S-14975 |
| Appellant, | ) | |
| | ) | Superior Court No. 4FA-11-00076 CN |
| v. | ) | |
| | ) | O P I N I O N |
| STATE OF ALASKA, | ) | |
| DEPARTMENT OF HEALTH & | ) | No. 6832 – October 4, 2013 |
| SOCIAL SERVICES, OFFICE OF | ) | |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Randy M. Olsen, Judge.

Appearances: Hanley Robinson, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant. Janell M. Hafner, Assistant Attorney General, and Michael C. Geraghty, Attorney General, Juneau, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

FABE, Chief Justice.

## I. INTRODUCTION

Kyle S. appeals the superior court's decision adjudicating his teenage daughter Jane a child in need of aid.[1] Jane was taken into State custody when she was 15 years old, after she reported being physically abused by her stepmother. The superior court based its adjudication decision on Jane's propensity to run away; it made no findings about either Kyle or his wife. At the time of the adjudication hearing, Jane was also involved with the Division of Juvenile Justice because of several criminal charges. Kyle challenges the court's adjudication decision, arguing that the statutory subsection about runaways is unconstitutional as applied to him and that the court incorrectly concluded that the State made active efforts to prevent the family's breakup. Because Kyle waived his constitutional argument by not raising it below and because the superior court's active-efforts decision is supported by the record, we affirm the superior court's decision.

## II. FACTS AND PROCEEDINGS

Jane S. is a 17-year-old Indian child.[2] At the time of the adjudication trial, Jane had been placed in Sitka, and her father was living in another state. Jane's mother died when Jane was young. Her father, Kyle, has been in a relationship with his current wife, Sybil, since 2002; they married when Jane was eight years old. Jane has an older maternal half sister, Dora; an older sister, Linda; and a younger stepsister, Brenda.

The Office of Children's Services (OCS) had sporadic contact with the family over the course of several years, largely due to concerns about domestic violence. Sybil was charged with assaulting Kyle several times; one criminal case included a charge of reckless endangerment in which Linda was the victim. According to a social

---

[1] We use pseudonyms throughout to protect the parties' privacy.

[2] 25 U.S.C. § 1903(4) (2006).

worker, OCS met with Kyle to develop care and safety plans in 2004 and 2006, which involved Sybil not being in the home with the children, but Kyle did not follow these plans. OCS took no legal action then because according to the social worker, "it didn't rise to the level for [OCS] to do court intervention."

Some time in early August 2011 the family decided to move to another state. Jane was taken into State custody on August 23. Three days later, at the first emergency custody hearing on August 26, Kyle told the court that the family had already leased a house in the other state, enrolled the children in school, and would be leaving Fairbanks on September 1. He told the court that they were moving to get medical treatment for him[3] and to get Jane away from her friends, whom he considered to be bad influences.

At the time of the events that prompted OCS to take custody of Jane, Linda, who was 18 years old, and Brenda also lived in the family home. In early August 2011 Jane reported that Sybil beat her with a belt to discipline her for failing to do her chores. Sybil used spanking with a belt to discipline all the children, but this time Jane "got mouthy" and refused to let Sybil spank her. Jane reported that Sybil slapped her, pulled her hair, and started hitting her with the belt. A social worker testified that Brenda corroborated Jane's account of the incident.

Kyle was in the garage at the time. He testified that he "became aware of an altercation" and intervened. Jane went to a neighbor's house; Linda took Brenda to the same neighbor's house and then left the home. Kyle and Sybil had a fight after Jane left. After someone contacted police, Jane was taken to a child advocacy center for an interview. She had bruises on her arms and legs and some scratch marks on her neck and

---

[3] Kyle has several medical conditions and is eligible for Social Security disability.

back. Sybil was arrested and ultimately charged with fourth-degree assault. The charges were unresolved at the time of the adjudication hearing.

A team decision meeting, which Kyle attended, was held on August 12. Those involved agreed to a safety plan, deciding that Jane would stay with a friend. Jane evidently got in trouble at the friend's house, and she was sent home. According to Kyle, Jane was back at home for nearly a week.[4] On August 18, in Sybil's criminal case, the court lifted a no-contact order between Sybil and Jane as long as Kyle or another adult was there. After the criminal hearing the OCS caseworker spoke to Sybil, asking her not to return to the home. Kyle told the social worker that in his opinion the criminal order took precedence over the safety plan and that OCS should not be involved with his family. Sybil returned to the family home that evening.

According to Kyle, he had set up a doctor's appointment for Jane after school for the day after Sybil's return, in compliance with the OCS plan,[5] but Jane skipped school and did not come home on the bus. Kyle testified that he found Jane "drinking in the woods" after looking for her "for a few hours." Jane asked to stay with her half sister Dora, and Kyle allowed her to do so. After Sybil returned to the house, OCS scheduled a second team decision meeting, which Kyle did not attend. OCS then took emergency custody of Jane and placed her with Dora.

Jane ran away from Dora's within a day or two. OCS sought, and the superior court granted, an order that she remain in placement; Kyle found her that weekend.

---

[4]     Sybil and Brenda were staying with relatives at the time.

[5]     Jane has a medical condition, and OCS was concerned it was not being treated adequately.

The superior court held a contested emergency temporary custody hearing on August 31 and September 1. At the end of the hearing, the superior court found probable cause to believe that Jane was a child in need of aid due to physical harm[6] (because of the allegations about Sybil's physical abuse) and mental injury[7] (because of the domestic violence between Kyle and Sybil). OCS again placed Jane with Dora.

Jane ran away from Dora's home several times in the ensuing months. According to Nicole Havrilek, the OCS social worker who took over the case in mid-September 2011 and who testified at the adjudication hearing, Jane ran away from Dora's house sometime in September[8] and was arrested in October. Jane ran away from Dora's home again in the fall and returned "right before the Thanksgiving holiday." Jane then stayed at Dora's for about four months without running away. According to a later mental health assessment of Jane, Dora said Jane had been doing well in school before March 2012, but "seemed to drift away — and was likely high several times." Dora reported that Jane "was lying more and more" and was "droopy-eyed" after school at times. Jane ran away again in early April 2012.

The parties attended a mediation session in early December and reached an agreement about steps to take to resolve the case. The court ordered an Interstate Compact on the Placement of Children home study in early February 2012 to determine whether Jane could be placed in Kyle's home. The other state denied placement with

---

[6]     AS 47.10.011(6).

[7]     AS 47.10.011(8).

[8]     Jane was missing when Havrilek took over the case.

Kyle "based on [Jane's] criminal involvement."[9] Kyle began counseling in late 2011 and continued until June 2012.

In early April 2012, after Jane was caught shoplifting, she ran away from Dora's house again and was missing for about a month; she had gone to Circle with her boyfriend, who was "slightly older." After Jane ran away in April, Dora found spice, or synthetic marijuana, in Jane's room.[10]

Jane was picked up in May near the Fairbanks Correctional Center, where her boyfriend was visiting his mother, who was in jail on drug-related charges; Jane was placed in Fairbanks Youth Facility (FYF), where she remained until July. While Jane was at FYF, Linda "brought Valium into the facility to her," evidently at Jane's request. Jane took some of the pills and gave some to other residents; she was charged with several drug-related crimes as a result. At the time of the CINA adjudication trial, not all of Jane's juvenile charges had gone to adjudication or disposition.

No one disputes that Jane has substance abuse problems. Her probation officer, Shay Daniels, testified that when Jane was picked up in May, her THC level was the highest that anyone in the juvenile probation office had ever seen. Jane reported having used spice, hallucinogenic mushrooms, and other inhalants like "whippets" and

---

[9] Jane's involvement with the Division of Juvenile Justice (DJJ) began before OCS took custody of her: Jane first had contact with DJJ when she was in junior high school; she was referred to DJJ after being caught with alcohol and marijuana on school grounds. In June 2011 Jane and a friend "ran off" after taking a cab and not paying for it. When Jane was stopped by police, she gave a false name. She was required to pay restitution and write an apology. Shortly after OCS took custody of her, Jane and two friends stole a backpack containing a video recorder and some money. In October 2011 Jane was again caught with marijuana at school, and DJJ filed its first formal petition. Further incidents happened in 2012.

[10] Jane later told an assessor that she used spice and "duster" because they did not show up on urinalysis testing.

"duster," as well as alcohol, tobacco, and marijuana. She reported to a DJJ substance abuse evaluator that she had used sedatives "for a couple of years on and off" and tried methadone once. Because of the severity of her substance abuse, OCS was initially not able to place her in a residential program it had selected for her.

DJJ and OCS arranged for Jane to go to Sitka in July for "an adventure based substance abuse treatment program" called Raven's Way. Daniels testified that the decision to place Jane at Raven's Way was based on Sitka's location on an island so Jane could not "run very far" if she ran away. At the time of the adjudication hearing Jane had completed the program at Raven's Way and was living at Hanson House, a "residential program that . . . deals with . . . juveniles who have emotional or mental health issues." Jane was attending public school, but she remained involved with DJJ.

An adjudication hearing was held in September and October, 2012. At the hearing, OCS asked the court to find Jane to be a child in need of aid based on her running away and the behaviors she engaged in when she was a runaway.[11] The State presented testimony about Jane's treatment to date, her substance abuse problems, and her involvement with DJJ. Kyle did not testify and presented no witnesses. Havrilek reported that Jane was doing well at Hanson House at the time of the adjudication hearing. Jane was in group therapy as well as individual therapy; she also attended Alcoholics Anonymous and Narcotics Anonymous meetings and received substance abuse counseling. Hanson House provided "therapeutic interventions . . . all throughout the day except for when she's sleeping." Although OCS did not allege parental conduct as a basis for a CINA finding, it justified retaining custody in part because of her home environment, particularly Sybil's history of violence. According to her counselor from

---

[11]     AS 47.10.011(5) provides that a child can be found to be a child in need of aid if "the child is habitually absent from home or refuses to accept available care and the child's conduct places the child at substantial risk of physical or mental injury."

Hanson House, Jane was "skeptical" that things had changed in her family home and was afraid of Sybil. The counselor testified that Jane had stated she would run away if she were returned to her father's home. At the time of the adjudication trial, Hanson House had not begun family therapy; the therapist testified that if family therapy occurred, it would begin in phase two of the program, and Jane was only in phase one.[12]

The testimony indicated that Kyle had found a counselor and attended counseling from late 2011 until June 2012. OCS began to pay for his treatment in February 2012, but there were ongoing problems with billings. Kyle and Havrilek had not communicated as agreed in the December mediation, and Havrilek did not know whether he had attended parenting classes or addressed other concerns she had.

Kyle had one in-person visit with Jane, in December 2011. Visitation was complicated by Jane's running away. OCS began to supervise Kyle's phone contact with Jane after OCS requested a paternity test "to undeniably establish paternity" and Kyle repeatedly asked Jane to tell the court she did not want the test.[13] Havrilek testified on October 1, 2012, that to the best of her knowledge, the last time Kyle had contact of any kind with Jane was in June 2012. Jane was not able to have phone contact while she was in Raven's Way because of the nature of the program. Havrilek left the issue of phone contact to Hanson House after Jane's admission there, so Havrilek had not given Kyle

---

[12]     Jane's therapist at Hanson House testified that the discharge plan as of the time of the adjudication trial was for Jane to possibly go to therapeutic foster care followed by independent living, or for placement with her paternal grandmother or Dora, and she testified that it was not always appropriate to work on repairing the child's relationship with the family of origin. Havrilek testified that the goal in the CINA case was reunification. Daniels indicated that DJJ's long-term plan was for Jane to "transition[] either back to [Dora] or maybe to her grandparents." Dora had moved to Connecticut by this time, and Jane's grandmother lived in Ohio.

[13]     Kyle opposed the request and balked at having the testing done; the test showed he is Jane's father.

information about how he could contact Jane at Hanson House if he wanted to. According to Havrilek, Jane had "historically" been interested in having contact with her father, but in the month preceding the adjudication hearing, Jane had not said she wanted to have contact with him. The Hanson House counselor testified that Jane did want to have contact with Kyle; she was unsure whether Jane had had any telephone contact with Kyle since arriving there, although she knew Jane was in contact with her sister. Havrilek agreed that Kyle had asked for contact with Jane, and Kyle wrote to the court in May complaining about his lack of contact with Jane.

Kyle argued in closing that OCS had not made active efforts to reunify the family, faulting OCS for failing to act earlier in the case to place Jane in a residential program and contending that OCS's actions had resulted in Kyle being "essentially estranged from his daughter and OCS coming up with essentially a transition plan that's going to involve keeping [Kyle] out of her life until she ages out of the system." Kyle argued that the State is empowered to take legal custody in a CINA case only "where there are severe parenting deficiencies or to prevent significant harm to the children."

The superior court found that Jane was a child in need of aid based on her conduct of running away and the behaviors she engaged in when on the run: "If she were to be turned loose, she would be on the run again in a weekend. . . . [S]he's run so many times that I've been involved plus . . . her own threats that she would." The superior court also said it would be surprised if Jane "stayed [in her placement] three days after hearing a decision that OCS was out of her life." The court found that OCS had made active efforts to prevent the breakup of the family, but the court expressed some doubt about whether the family would be reunified before Jane turned 18, saying:

> [T]here have been a lot of efforts and they have been active in trying to provide remedial services, both to the family and to the girl individually to help them mature and to develop into a position where they can be reunified at some

time. . . .[B]ecause of the time frames involved, because of the DJJ involvement, I believe that that is probably not going to happen before she turns 18, but at the same time, I have long range hopes that they can deal with each other as adults in a way that is healthy.

Kyle appeals, arguing that OCS did not make active efforts to prevent the family's breakup and that AS 47.10.011(5) is unconstitutional as applied to him.

## III. STANDARD OF REVIEW

The question whether OCS made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of an Indian family is a mixed question of law and fact.[14] We review factual findings for clear error and conclusions of law de novo.[15] A finding is clearly erroneous if we are "left with a definite and firm conviction that a mistake has been made after a review of the entire record in the light most favorable to the party prevailing below."[16] We review issues of statutory and constitutional construction de novo, adopting the rule of law that is most persuasive in light of precedent, reason, and policy.[17] In CINA cases, we review issues that were not raised in the trial court for plain error.[18]

---

[14] *Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 961 (Alaska 2013) (citing *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1111 (Alaska 2010)).

[15] *Id.* (citations omitted).

[16] *Lucy J.*, 244 P.3d at 1111 (citations and internal quotation marks omitted).

[17] *Smart v. State, Dep't of Health & Soc. Servs.*, 237 P.3d 1010, 1014 (Alaska 2010) (quoting *Pepper v. Routh Crabtree, APC*, 219 P.3d 1017, 1020 (Alaska 2009)).

[18] *Lucy J.*, 244 P.3d at 1111 (citing *Adoption of L.E.K.M.*, 70 P.3d 1097, 1100 (Alaska 2003)).

## IV.    DISCUSSION

### A.    Kyle Waived His Argument That The Statute Is Unconstitutional As Applied To Him.

Kyle challenges the constitutionality of AS 47.10.011(5) as applied to him because it permits the State to take legal custody of his child without any requirement that the State show he is an unfit parent.[19]  He concedes he did not raise this issue in the trial court, but he nonetheless argues that this court should apply its independent judgment to his constitutional argument.  He contends that the trial court's finding that Jane was in need of aid without any predicate finding of parental unfitness was plain error because the finding affected a substantial right and was prejudicial.  The State argues that Kyle waived the issue by failing to raise it below, maintains there is no plain error, and contends the statute is constitutional in any event.

"[P]lain error exists in a CINA case where 'an obvious mistake has been made which creates a high likelihood that injustice has resulted.' "[20]  Kyle argues that the trial court's finding that Jane was in need of aid without finding that he was unfit was an "obvious injustice" because it "runs contrary to the presumption of parental fitness and the constitutional right to parent."  He contends an adjudication with no finding of

---

[19]    AS 47.10.011 provides that

> the court may find a child to be a child in need of aid if it finds by a preponderance of the evidence that the child has been subjected to any of the following:
>
> . . . .
>
> (5) the child is habitually absent from home or refuses to accept available care and the child's conduct places the child at substantial risk of physical or mental injury[.]

[20]    *Lucy J.*, 244 P.3d at 1118 (quoting *Marcia V. v. State, Office of Children's Servs.*, 201 P.3d 496, 502 (Alaska 2009)).

parental unfitness can set the stage for termination of parental rights of a fit parent, which would be plainly unconstitutional. The State responds that the case was not a termination case and that AS 47.10.088, the involuntary-termination statute, independently protects parents' rights by requiring a showing of parental misconduct.

The trial court's failure to consider the possibility that the statute might be unconstitutional was not an obvious mistake. Kyle argues on appeal that the statute is unconstitutional as applied to him, not that it is facially invalid.[21] An as-applied challenge requires evaluation of the facts of the particular case in which the challenge arises.[22] We made this distinction in *State, Department of Revenue, Child Support Enforcement Division v. Beans*, where we observed that a statute permitting the State to suspend the driver's license of child support obligors who were delinquent "would be unconstitutional as applied" if the delinquent parent was unable to pay child support, but would be constitutional in cases of parents who were capable of paying support.[23] Kyle never asked the trial court to examine the facts of his case and consider whether the statute as applied to his facts was unconstitutional. He did not argue that the State needed to show that he was unfit in order to find Jane a child in need of aid, so the trial court did not make factual findings related to a constitutional challenge. The trial court was not asked to make findings about Sybil's physical abuse of Jane, so it did not do so,

---

[21]     *See State v. Am. Civil Liberties Union of Alaska*, 204 P.3d 364, 372 (Alaska 2009) (quoting *State, Dep't of Revenue, Child Support Enforcement Div. v. Beans*, 965 P.2d 725, 728 (Alaska 1998)) (discussing difference between facial and as-applied constitutional challenges).

[22]     *Id.*; *see also Phelps-Roper v. Troutman*, 712 F.3d 412, 416-17 (8th Cir. 2013) (remanding as-applied challenge to district court for development of factual record).

[23]     *Beans*, 965 P.2d at 727-28.

but the trial court recognized that Jane's diagnosis of posttraumatic stress disorder and the pending criminal charges against Sybil supported an inference that Sybil had physically abused Jane, as Jane reported. Moreover, Jane's first incident of running away occurred when Sybil moved back into the house over OCS's objection. Kyle's closing argument at trial did suggest that the legislature only intended the State to take custody when "there are severe parenting deficiencies or to prevent significant harm to the children," but this argument, which was not raised on appeal, was made only in the context of an argument that DJJ and OCS should not have dual custody; he never mentioned the Constitution or due process. Because Kyle did not raise this constitutional argument in the trial court, permitting it to make factual findings related to the challenge, and has not shown plain error, his constitutional argument has been waived.

**B.      The Trial Court Did Not Err In Deciding That The State Made Active Efforts To Prevent The Breakup Of This Indian Family.**

Pursuant to AS 47.10.086(a), OCS must, in most cases, make "timely, reasonable efforts to provide family support services to the child and to the parents . . . that are designed to prevent out-of-home placement of the child or to enable the safe return of the child to the family home, when appropriate, if the child is in an out-of-home placement." In an ICWA case, 25 U.S.C. § 1912 requires that OCS make active efforts at family reunification.[24] "[T]he 'active efforts' requirement of ICWA is more demanding than the 'reasonable efforts' requirement of AS 47.10.086."[25] We review the

---

[24]      *Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 222 P.3d 841, 849 (Alaska 2009) (citing 25 U.S.C. § 1912(d) (2006)).

[25]      *Winston J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 134 P.3d 343, 347 n.18 (Alaska 2006).

decision that OCS made active efforts "on a case-by-case basis."[26] "As opposed to passive efforts such as simply developing a plan for the parent to follow, active efforts require that the state actually help the parent develop the skills required to keep custody of the children."[27] We consider "the State's involvement in its entirety" in assessing whether the State met its burden.[28]

Kyle argues that OCS failed to make reasonable, active efforts in this case. He argues that the efforts directed at Jane were unreasonable overall and that the State did not make active efforts directed at him. OCS responds mainly by discussing the services the State provided to Jane, but it also notes that OCS paid for Kyle's counseling and brought him to Alaska for an in-person visit with Jane.

Kyle does not contest on appeal that Jane was in need of aid as a result of her running away and the behavior she displayed when she ran away. Jane ran away repeatedly. Kyle agreed at the emergency probable-cause hearing that she had a substance abuse problem and testified that she had tested positive for marijuana every time she had been tested. Jane also had mental health diagnoses and needed treatment for her mental conditions: She was diagnosed with depression and posttraumatic stress disorder, which the mental health clinicians attributed to Sybil's having abused her throughout the time Sybil lived with Kyle. Sybil remained in Kyle's home, and Jane's counselor testified that returning Jane to Kyle's home would put Jane at risk of relapse

---

[26]     *Doe v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 272 P.3d 1014, 1020 (Alaska 2012) (citing *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999)).

[27]     *Dashiell R.*, 222 P.3d at 849 (citation omitted).

[28]     *Doe*, 272 P.3d at 1020 (quoting *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 763-64 (Alaska 2009)) (internal quotation marks omitted).

and running away because Jane did not feel safe. One counselor testified that Jane had been traumatized by the domestic violence between Sybil and Kyle. Jane's mental health and substance abuse issues, her statements that she would run away if returned to Kyle's home, the risky behaviors Jane engaged in while on the run, and the trial court's own experience with her repeatedly running away from placements were the reasons the court found her to be in need of aid. The court was concerned that Jane would "sabotage her own progress to avoid going home" if OCS did not remain involved in her case, and it found that an out-of-home placement was necessary to prevent imminent harm to her.

Kyle's argument on appeal centers on OCS's emphasis on providing services to Jane rather than to the family.[29] When a child is placed in state custody, OCS must address the particular family needs that caused the child to be in need of aid.[30] In Jane's case, those needs were related to her running away, and her associated substance abuse and mental health issues. The trial court found at the adjudication hearing that Jane was in need of aid because of her behavior — her repeated running away and the activities she engaged in when she ran away, particularly her substance abuse. Because *Jane's* behavior was the cause of her adjudication as a child in need of aid, the State was justified in concentrating its efforts on addressing *Jane's* problems, even if that meant

---

[29]  Kyle also contends that Jane's "behavior would not have reached a point where she needed to reside in FYF" if OCS had not removed her from his care. But this assertion is speculative. There is simply no way to know how Jane would have behaved had she not been removed from the home.

[30]  *Cf. Burke P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 162 P.3d 1239, 1245 (Alaska 2007) ("Our starting point for evaluating OCS's reunification efforts is the identification of the problems that caused the child or children to be in need of aid.").

delaying her reunification with Kyle.**31** Jane's therapist at Hanson House did not begin family therapy until phase two of the program in order to "establish[] a strong rapport with the individual client" before bringing the family in. At the time of the adjudication trial, Jane was "midway through phase one" of a four-phase program. Because of Jane's age and her involvement with DJJ, the trial court noted that reunification was "probably not going to happen before [Jane] turns 18," but the court also thought "it [was] critical to her survival" that she remain in OCS custody and receive the services she was getting at Hanson House. This finding is supported by the record: Jane's therapist testified that Jane was at extreme risk if she was removed from the program and returned to Kyle's custody.

The State has an interest in protecting children when they place themselves at serious risk of harm, even when a parent is blameless.**32** Jane placed herself "at substantial risk of physical or mental injury" whenever she ran away.**33** Daniels and Havrilek testified that Jane not only abused a number of illegal drugs, particularly marijuana, but also associated with "dangerous people" and engaged in risky behavior while on the run. According to Havrilek, during the time Jane was out of Dora's home in April and May, Jane "reported having a lot of contact with weapons" including shooting them and having one in her possession when she was arrested in May. Daniels

---

**31** We reiterate that we evaluate active efforts on a case-by-case basis. *Doe*, 272 P.3d at 1020 (citing *A.A.*, 982 P.2d at 261). Our analysis could be different if Jane were younger or if this were a termination trial.

**32** *See L.A.M. v. State*, 547 P.2d 827, 834 (Alaska 1976) (identifying State's interest in protecting runaways). *See also In re Sumey*, 621 P.2d 108, 110-11 (Wash. 1980) (discussing balance between parents' rights to custody of child and State's interest in protecting children's best interests).

**33** AS 47.10.011(5).

testified that Jane "seem[ed] to be very interested . . . in boys who are a little older than she is who are involved in . . . substance abuse, with drugs, and . . . having unprotected sex." Jane was expelled from one school for her behavior and was far enough behind in getting credits that she was not likely to graduate on time. The adjudication decision was a determination that Jane needed to be in the custody of the State for her own protection; the court was not considering termination of Kyle's parental rights, a much more drastic intervention.[34] The State's efforts in their totality, including those made by DJJ, were active efforts intended to address the problems that made Jane a child in need of aid. There is ample support for finding that the State made efforts to assist Jane in treating both her mental health conditions and her substance abuse. The trial court correctly concluded that these efforts met the active efforts requirements of ICWA.

## V. CONCLUSION

For the foregoing reasons, we AFFIRM the superior court's decision adjudicating Jane a child in need of aid.

---

[34] *See Hannah B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 289 P.3d 924, 930 (Alaska 2012) ("[W]e bear in mind at all times that terminating parental rights is a drastic measure." (quoting *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1104 (Alaska 2011)) (internal quotation marks omitted)).