NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

# THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| LAURA M.-J., | ) |
| | ) Supreme Court No. S-18094 |
| Appellant, | ) |
| | ) Superior Court No. 4FA-15-00055 CN |
| v. | ) |
| | ) <u>MEMORANDUM OPINION</u> |
| STATE OF ALASKA, DEPARTMENT | ) <u>AND JUDGMENT</u>* |
| OF HEALTH & SOCIAL SERVICES, | ) |
| OFFICE OF CHILDREN'S SERVICES, | ) No. 1907 – July 20, 2022 |
| | ) |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Michael A. MacDonald, Judge.

Appearances: Mila A. Neubert, Neubert Law Office, LLC, Fairbanks, for Appellant. Kimberly D. Rodgers, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee. Jasmine N. Johnson, Assistant Public Advocate, Fairbanks, and James Stinson, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Winfree, Chief Justice, Maassen, Borghesan, and Henderson, Justices. [Carney, Justice, not participating.]

## I.    INTRODUCTION

After the superior court terminated a mother's parental rights to a young child, the Office of Children's Services (OCS) placed the child with a woman in

---

\*      Entered under Alaska Appellate Rule 214.

Washington, who fostered the child for nearly three years and intended to adopt. After the woman lost her foster care license and Washington authorities received reports of conflict in her home, OCS transferred the child to a different foster placement. The woman challenged OCS's decision to transfer placement, and the superior court affirmed.

The woman appeals, raising several arguments for the first time. She argues that because she had previously adopted the child's older siblings, she met the statutory definition of an adult family member whom Alaska law prefers for placement. Therefore she maintains that the superior court should have placed the burden on OCS to justify the transfer by clear and convincing evidence. She also argues that procedural shortcomings — including the court's failure to enter permanency findings for over a year and OCS's decision to notify her of the transfer only a single day in advance — require that we vacate the transfer and return the child to her. Reviewing these issues for plain error, we find none and affirm the superior court's decision.

## II.    FACTS AND PROCEEDINGS

### A.    Removal And Initial Placements

Amy,[1] an Indian child under the Indian Child Welfare Act (ICWA),[2] was removed from her family home by OCS in April 2015, when she was two years old, and placed in a temporary foster home.

OCS planned to place Amy with Laura, who had adopted three of Amy's older half-sisters. Amy's parents relinquished their parental rights in July 2016. Amy's

---

[1]    We use pseudonyms to protect the parties' privacy.

[2]    *See* 25 U.S.C. § 1903(4) ("'Indian child' means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe[.]").

mother did so on the understanding that Amy would be placed with Laura and on the condition that OCS would notify Amy's mother if that placement were no longer available.

## B.     Adoption Process

Before OCS could place Amy with Laura, who lived in Washington, OCS was required to obtain Washington's approval under the Interstate Compact on the Placement of Children (ICPC).[3]  And before OCS could approve Laura's adoption of Amy, Laura had to receive a positive home study and foster Amy in her home for a period of time.  Laura began the process to become a licensed foster parent in August 2016.  In spring 2017 Washington authorities completed a home study and approved Amy's foster care placement with and adoption by Laura.  The report noted that Laura had recently separated from her husband and was proceeding with the adoption as a single parent.  Amy's two oldest half-sisters had moved out of the house but the youngest, nine-year-old Georgia, was still living with Laura.  The social worker noted that Laura had many difficulties during the home study process, such as failing to timely complete paperwork and accommodate required visits.

Following approval by the Washington authorities, the superior court held a permanency hearing and issued findings approving the goal of adoption with Laura as the adoptive parent.  OCS transferred Amy to Laura's care in June 2017, and Laura helped Amy adjust to her new life.  Washington social workers visited monthly, and OCS periodically checked in with phone calls.  The court vacated a scheduled permanency hearing in March 2018, as no petition for permanency report had been filed

---

[3]     *See* AS 47.70.010 ("The child shall not be sent, brought, or caused to be sent or brought into the receiving state until the appropriate public authorities in the receiving state shall notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child.").

and the adoption process was still ongoing. Throughout the process Laura regularly inquired about the status of the adoption.

In working to approve the adoption, OCS sought the approval of Amy's tribe.[4] OCS held review meetings about the adoption every six months, inviting Laura to attend. At a June 2018 review OCS noted that the tribe had not responded to OCS's request for approval and that Laura did not want to proceed without tribal approval. By mid-2019 OCS decided it had good cause to deviate from the ICWA preferences[5] and proceed with the adoption. OCS requested another Washington home study in June 2019 because the first home study, completed before Amy moved into Laura's home over two years earlier, was no longer current under OCS policy[6] and did not meet OCS's requirement that it be completed after the child has lived in the home long enough for workers to assess the relationship between the child and family.[7] Shortly thereafter OCS filed and the court granted a petition to extend OCS custody of Amy for a year, noting that the current placement met Amy's needs and acknowledging the difficulty of obtaining tribal approval.

Washington conducted another home study in November 2019. It declined to approve adoption because Laura could not meet Washington's income requirements,

---

[4]     Under ICWA, preferences in adopting an Indian child are given to the child's extended family, other tribal members, or other Indian families, in that order. 25 U.S.C. § 1915(a). ICWA permits the Indian child's tribe to establish a different order of preference. 25 U.S.C. § 1915(c).

[5]     25 U.S.C. § 1915(a)-(b) (providing that ICWA's statutory placement preferences are to be followed "in the absence of good cause to the contrary").

[6]     ALASKA OFF. OF CHILD.'S SERVS., CHILD PROTECTIVE SERVS. MANUAL § 3.23.5 (2017).

[7]     *Id.* § 3.15.4 (2017) (amended June 1, 2017). The OCS manual provides that three months of placement is presumptively reasonable. *Id.*

having lost the spousal support she was receiving during divorce proceedings. Laura found employment a few weeks later. In April 2020, after Laura had been employed for a sufficient length of time, OCS requested another home study. But by then Laura's foster care license had expired. Laura was aware her license was expiring but did not seek renewal because she hoped to finalize the adoption before it expired.

OCS and Washington authorities granted Laura a 90-day extension to renew her foster care license. Both agencies had difficulty engaging Laura to take the necessary steps to renew her license, as she was slow to return documents and canceled a home inspection at the last minute due to her work schedule. Washington warned Laura that failure to complete the renewal could impact Amy's placement in her home.

Washington ultimately declined to renew Laura's license. Laura lost her job in late July and did not verify her income as required for the license renewal. Laura also resisted signing a release for certain court records needed for the renewal process (including a current custody order for Georgia, following Laura's ex-husband's attempts to modify custody).

Additionally, Washington authorities began investigating reports of harm Laura's ex-husband had made about Amy's half-sister Georgia. Washington social workers were concerned about the chaotic nature of Laura's home, primarily due to conflict between Georgia and Laura. Due to these concerns the workers supported Georgia's filing a petition to move out of Laura's house. A nurse in Amy's pediatrician's office raised concerns that Laura seemed more chaotic than normal. In a request for permanency findings in September 2020, OCS reported that Laura was an appropriate placement and met Amy's best interests. Yet OCS stated it had concerns with Laura's home and was meeting weekly to discuss the appropriateness of Amy's continued placement with Laura.

## C. Removal From Laura's Home

OCS removed Amy from Laura's home on October 2, 2020. An OCS caseworker traveled to Washington to pick up Amy, notifying Laura only one day in advance. On the journey back, Amy told the caseworker about conflict between Laura and Georgia that had scared and upset her. Once in Alaska Amy spoke with Laura one time by phone but otherwise declined the caseworker's offer to speak with Laura. OCS then decided to stop telephonic visits between them to ease Amy's transition to her new foster family. It is unclear from the record if OCS informed Amy's birth mother that placement with Laura had fallen through, as required by the terms of her relinquishment.

Now with a new foster family,[8] Amy attended therapy. The therapist later testified that Georgia and Laura's fighting had been "extremely disruptive" to Amy and "occurred quite frequently," noting that according to Amy, some fights became physical and led to police involvement. The therapist also testified that Amy and Laura fought as well, and that Amy had described "aggressive" communication and physical contact between the two.

By November 2020 Georgia had left Laura's home and moved in with an adult sister. Washington authorities ultimately found that the reports of abuse or neglect in Laura's home were unfounded.

## D. Placement Change Review Hearing

Laura moved the superior court to review the placement transfer.[9] The superior court held a hearing over four days in April and May 2021, with testimony from several witnesses including Laura, an expert witness retained by Laura, OCS workers,

---

[8] At oral argument, OCS's counsel represented that Amy had been adopted by her new foster parents.

[9] *See* AS 47.10.080(s) (authorizing party opposed to transfer to request hearing before superior court); CINA Rule 19.1(b) (same).

Amy's therapist, and Amy's new foster mother. At the outset of the hearing the superior court explained that under Alaska Child in Need of Aid (CINA) Rule 19.1(b) Laura, as the party opposed to Amy's transfer, bore the burden of proving by clear and convincing evidence that the transfer was contrary to Amy's best interests.

In an oral ruling the superior court ruled that Laura "ha[d] standing as the long-term foster placement" and "ha[d] sufficient interest under the circumstances of this case to request a placement review hearing." The court reiterated Laura's burden as the moving party to prove by clear and convincing evidence that the transfer was contrary to Amy's best interests, noting it would review OCS's conclusions for abuse of discretion.

The court acknowledged the long delays occasioned by the interstate nature of the case and the tribe's failure to approve adoption. It also credited Laura for her "heroic" and "extraordinary" efforts as a foster parent, emphasizing that she was not an unfit parent. But the court ruled that OCS's decision to transfer was justified by "the disintegration of the family, the chaos, the failure to get an approved home study, and being many, many months without a license." The superior court also concluded that it would be contrary to Amy's welfare to remove her from her current placement and return her to Laura. The court then approved OCS's permanency plan of Amy's adoption by her current foster family.

Laura appeals the superior court's decision upholding the transfer.

## III. STANDARDS OF REVIEW

The parties dispute the legal framework that applies to Laura's challenge to the placement transfer. This dispute may affect the standard of review we apply to the superior court's decision.

We long ago held in *In re B.L.J.* that the superior court reviews OCS's initial placement decisions for abuse of discretion, focusing on whether the placement

was in the best interests of the child.[10]  But in some cases the superior court must apply a different legal standard.  Alaska law prefers placing a child with an "adult family member" and permits OCS to deviate from this preference only upon "clear and convincing evidence of good cause."[11]  If OCS does deviate, the superior court must determine whether OCS has met its burden of clear and convincing evidence instead of reviewing whether the placement was an abuse of discretion.[12]

When a transfer of placement is challenged, a law enacted after *In re B.L.J.* arguably applies a different framework.[13]  Pursuant to AS 47.10.080(s), the superior court may deny a transfer if the party challenging it "prove[s] by clear and convincing evidence that the transfer would be contrary to the best interests of the child."[14]  We have not addressed how the statutory standard for superior court review of placement transfers should be reconciled with the standard of review for placement decisions generally or how these standards might differ.

Although at the outset of its decision upholding the placement transfer the superior court stated that "the requesting party must prove by clear and convincing evidence that the transfer would be contrary to the best interests of the child," the court framed its conclusion in terms of whether OCS abused its discretion in changing Amy's placement.  Laura argues that she is Amy's adult family member by virtue of having previously adopted Amy's half-siblings so that in this case it was OCS's burden to show

---

[10]     717 P.2d 376, 380-81 (Alaska 1986).

[11]     AS 47.14.100(e).

[12]     *Irma E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 312 P.3d 850, 853-54 (Alaska 2013).

[13]     Ch. 99, § 30, SLA 1998.

[14]     AS 47.10.080(s); *see also* CINA Rule 19.1(b).

clear and convincing evidence of good cause to place Amy with someone else. But aside from arguing that the superior court should have placed the burden on OCS to justify the transfer, Laura does not describe how the abuse-of-discretion standard and contrary-to-best-interests standard should be reconciled or suggest that the court erred by framing its conclusion in terms of abuse of discretion. We therefore do not address those questions.[15]

We consider only the questions whether: (1) Laura was an "adult family member" so that OCS bore the burden of proof to justify the transfer; (2) the transfer was an abuse of discretion (in light of the best interests of the child); and (3) procedural failures by OCS and the superior court — including the failure to request or make permanency findings and the short notice of Amy's transfer to a new placement — require us to vacate the transfer.

Questions of statutory interpretation are questions of law that we review de novo.[16] We review the superior court's decision that OCS's transfer decision was not an abuse of discretion as a mixed question of law and fact.[17] "For mixed questions of law and fact, we review factual questions under the clearly erroneous standard and legal questions using our independent judgment."[18] "Findings of fact are clearly erroneous if

---

[15]     *See Ray v. Ray*, 115 P.3d 573, 578 (Alaska 2005) (holding argument not made on appeal is waived).

[16]     *See State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs. v. Zander B.*, 474 P.3d 1153, 1162 (Alaska 2020) ("Statutory interpretation raises questions of law to which we apply our independent judgment[,] . . . adopt[ing] the rule of law that is most persuasive in light of precedent, reason, and policy.").

[17]     *See id.*

[18]     *Id.* (internal quotation marks omitted) (quoting *Lindbo v. Colaska, Inc.*, 414 P.3d 646, 651 (Alaska 2018)).

a review of the entire record in the light most favorable to the prevailing party below leaves [us] with a definite and firm conviction that a mistake has been made."[19]

Several of Laura's arguments were not raised below. We review these arguments for plain error, which exists when "an obvious mistake has been made which creates a high likelihood that injustice has resulted."[20]

## IV. DISCUSSION

### A. The Superior Court Did Not Commit Plain Error By Declining To Treat Laura As An Adult Family Member Or By Declining To Place The Burden On OCS To Justify The Transfer Of Placement.

Alaska law gives adult family members the highest priority as foster care placements when a child is removed from the parent's home.[21] Laura argues that she is Amy's adult family member, making it OCS's burden to prove good cause to place Amy with someone else by clear and convincing evidence.[22]

Laura did not preserve this argument in the superior court. Although she asserted she was an adult family member under AS 47.10.990(1)(B) in her initial petition to review the transfer, she failed to object to the superior court's rulings at the start and

---

[19] *Sam M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 442 P.3d 731, 736 (Alaska 2019) (alteration in original) (quoting *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 526 (Alaska 2013)).

[20] *Kyle S. v. State, Dep't of Health & Soc. Servs. Off. of Child.'s Servs.*, 309 P.3d 1262, 1267 (Alaska 2013) (internal quotation marks omitted) (quoting *Lucy J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 244 P.3d 1099, 1118 (Alaska 2010)).

[21] AS 47.14.100(e)(3)(A).

[22] *See Irma E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 312 P.3d 850, 853 (Alaska 2013); AS 47.14.100(e) ("The department shall place the child, in the absence of clear and convincing evidence of good cause to the contrary, . . . with, in the following order of preference, [first] an adult family member . . . .").

end of the hearing that she bore the burden of showing the transfer was unjustified. We therefore review this point for plain error.[23]

An "adult family member" is defined to include "the child's sibling's legal guardian or parent."[24] Laura insists this definition includes her because she previously adopted Amy's blood siblings, making Laura their legal parent.

Although Laura is a legal parent of Amy's blood siblings, they are no longer Amy's legal siblings. "A final decree of adoption" in Alaska "terminate[s] all legal relationships between the adopted person and the natural parents and other relatives of the adopted person, so that the adopted person thereafter is a stranger to the former relatives for all purposes."[25] Any exceptions to this rule must be explicitly stated. In *In re W.E.G.* we considered whether a statute permitting court-ordered visitation in divorce, custody, or CINA cases[26] was intended to permit visitation after the child had been

---

[23]     *See Kyle S.*, 309 P.3d at 1267.

[24]     AS 47.10.990(1)(B).

[25]     AS 25.23.130(a); *see also In re W.E.G.*, 710 P.2d 410, 414 (Alaska 1985) ("[Alaska Statute 25.23.130(a)] clearly provides, however harshly, that the final decree has the effect of making an adopted child a 'stranger' to former relatives. The *only* exception set forth by the legislature is a provision allowing the court to provide for continuation of inheritance rights."), *superseded by statute on other grounds as recognized in In re A.F.M.*, 960 P.2d 602, 605 n.4 (Alaska 1998).

[26]     AS 25.24.150(a) ("In an action for divorce or for legal separation, for placement of a child when one or both parents have died, or as part of a child-in-need-of-aid proceeding for a child in state custody under AS 47.10, the court may . . . make, modify, or vacate an order for the custody of or visitation with the minor child that may seem necessary or proper, including an order that provides for visitation by a grandparent or other person if that is in the best interests of the child.").

adopted.[27] Because the visitation statute did not specify that grandparents could visit grandchildren following their adoption, we held it was not intended to create an exception to the adoption statute's strict rule that adoption terminates all preexisting relationships.[28]

The definition of "adult family member" in AS 47.10.990(1) does not expressly extend the sibling relationship beyond adoption. As the State points out, the legislature has shown that it knows how to define "sibling" in a way that includes biological siblings who were adopted.[29] That particular language does not appear in the definition of "adult family member."

Laura argues that the State's interpretation would give no preference to adoptive parents of an Indian child's blood siblings, contrary to ICWA's purpose to keep Indian families together. Not so. If an Indian child's tribe has defined an "extended family member" for placement purposes to include adoptive parents of blood siblings, AS 47.10.990 gives effect to the tribe's definition.[30] Instead it is Laura's interpretation

---

[27]    *In re W.E.G.*, 710 P.2d at 414-15.

[28]    *Id.* The legislature subsequently amended the statute to explicitly permit post-adoption visitation orders. *See* AS 25.23.130(c) ("Nothing in this chapter prohibits an adoption that allows visitation between the adopted person and that person's natural parents or other relatives."); *In re A.F.M.*, 960 P.2d at 605 n.4.

[29]    *E.g.*, AS 47.10.093(b)(16) (providing that, for the purpose of releasing child welfare records, " 'sibling' means an adult or minor who is related to the child who is the subject of the case by blood, adoption, or marriage as a child of one or both of the parents of the child who is the subject of the case; *a sibling who is adopted by a person other than the parent of the child who is the subject of the case remains a sibling of the child*" (emphasis added)).

[30]    AS 47.10.990(1)(C); 25 U.S.C. § 1903(2) (defining "extended family member" to defer to the Indian child's tribe or otherwise including the Indian child's

(continued...)

of AS 47.10.990 that seems contrary to ICWA because it would give someone in her position the same placement priority as those relatives whom ICWA expressly grants placement priority.[31]

Given our precedent applying the adoption statute and the text of AS 47.10.990, the superior court did not commit an obvious error by not treating Laura as an adult family member and not placing the burden on OCS to justify the transfer by clear and convincing evidence.

**B.      The Superior Court's Decision To Uphold Amy's Placement Transfer Was Not Erroneous.**

Laura challenges both the superior court's factual findings and its conclusion that these facts can justify the decision to transfer Amy's placement. We review the superior court's factual findings for clear error and its determination that OCS did not abuse its discretion de novo.[32]

**1.      Lack of a foster care license**

The superior court affirmed Amy's transfer in part because Laura was "many, many months without a [foster care] license." Laura argues that she needed only to be eligible for a foster care license, not to actually have a license, for Amy's continued placement with her. This argument is based on AS 47.14.100(e) and (m), which do not

---

[30]      (...continued)
grandparents, aunts and uncles, and brothers and sisters, among others).

[31]      *See* 25 U.S.C. § 1915(a) (granting adoptive placement preference to "a member of the [Indian] child's extended family"); 25 U.S.C. § 1903(2) (defining "extended family member" to include Indian child's "grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent").

[32]      *Cf. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs. v. Zander B.*, 474 P.3d 1153, 1162 (Alaska 2020).

require adult family members to have a license to receive placement so long as they are able to meet licensing requirements.[33]  As noted above, Laura did not preserve the argument that she is an adult family member, and it was not obvious that she was. Therefore it was not plain error to determine that she was required to actually have a license.[34]  The record confirms that her license expired and was never renewed.  The superior court did not clearly err by finding that Laura's license expired, and it appropriately relied on this finding in its decision.[35]

### 2.    Lack of approved home study

Laura next argues that the superior court's findings regarding the Washington home study were clearly erroneous.  She also challenges the court's related conclusion that Amy's removal was justified by "the failure of the foster parent and preadoptive home to have an approved home study," arguing instead that the record is "abundantly clear" that OCS was to blame for the delay.

Washington authorities completed a home study for Laura as part of the ICPC process prior to Amy's placement in May 2017.  However, under OCS policy an

---

[33]    AS 47.14.100(m) ("Prima facie evidence of good cause not to place a child with an adult family member . . . includes the failure to meet the requirements for a foster care license . . . ."); AS 47.14.100(e)(3)(C) (requiring a "foster home that is not an adult family member or friend" to be licensed for placement).

[34]    *See* AS 47.14.100(e)(3)(C).  Washington also requires non-relatives like Laura to have a foster care license.  *See* Wash. Rev. Code § 74.15.040 (2022) ("[A]gencies and the department shall not place a child . . . in a home until the home is licensed.").

[35]    As the State points out, AS 47.14.100(m) undermines Laura's claim that her lapsed foster care license was an insufficient reason to transfer a foster child, since the statute itself emphasizes that, even for adult family members, the "failure to meet the requirements for a foster care license" is "[p]rima facie evidence of good cause" to deny placement in that home.

adoption home study is valid only for two years and must be performed after a child has been living in the home for a few months.[36] After OCS spent significant time waiting for Amy's tribe to approve the adoption — in part because Laura did not want to proceed without tribal approval — OCS requested a home study in the middle of 2019. Washington denied approval in November 2019 because Laura, at the time unemployed and having lost spousal support, was unable to meet income requirements. OCS asked for another home study after Laura maintained employment for a few months, but by that time her foster care license was expiring. OCS secured a 90-day extension for Laura to complete the renewal, but Laura was unable to timely complete the paperwork. Laura never obtained an approved home study.

Given this record, we cannot conclude that the superior court's factual findings regarding the home study were clearly erroneous. Laura needed to have a successful and current adoption home study before OCS could approve her adoption of Amy. OCS's policy of requiring a home study within the past two years is reasonable: it increases the likelihood that OCS has an accurate picture of the prospective adoptive home. Reasonable, too, is its policy of requiring a child to live in the home for several months before a home study can be completed, since doing so permits "the homestudy writer to make an assessment of how the family and the child are relating to one another."[37] Nor does the testimony make it "abundantly clear" that the lack of a study was OCS's fault, as Laura argues. Instead the evidence shows that the delay was largely the result of a series of events outside OCS's control: waiting for tribal approval, complications stemming from Laura's divorce, and Laura's own difficulties in

---

[36] *See* ALASKA OFF. OF CHILD.'S SERVS., CHILD PROTECTIVE SERVS. MANUAL § 3.23.5 (2017); *id.* at § 3.15.4 (2017) (amended June 1, 2017). Laura does not argue that these policies are contrary to law.

[37] *Id.* at § 3.15.4 (2017) (amended June 1, 2017).

completing necessary documentation. Because the adoption home study was necessary to move forward with adoption, Laura's failure to obtain a current study was an appropriate consideration in evaluating the transfer decision. Laura's challenge to the superior court's conclusion on this point fails.[38]

### 3. Foster family and conflict

Third, Laura disputes the superior court's ruling that the disintegration of her family and chaos in her home justified Amy's transfer. Yet the evidence supports the court's factual findings that these circumstances existed and its conclusion that they supported OCS's decision to transfer Amy.

The record contains evidence that conflict between Laura and Georgia — who according to the superior court "was one of the significant ties in th[e] home that really supported [Amy's] placement" — was harmful to Amy. Although Laura suggests that Amy denied the reports of harm in an interview, Amy later confided in both an OCS worker and her therapist that the conflict was destabilizing. Washington social workers had observed that Amy was "aggravated about what[ was] going on in her home" between Georgia and Laura, and the agency supported Georgia's leaving the home. A nurse in Amy's pediatrician's office had observed that Laura was "more chaotic than normal," and there was evidence that fights in the home led to police involvement. Given this evidence, the superior court did not clearly err by finding conflict in Laura's

---

[38] Laura also contends that relying on the issues with spousal support violates AS 47.14.100(m)'s provision that "poverty" is not "[p]rima facie evidence of good cause not to place a child with an adult family member." But Laura did not establish that she is an adult family member and did not argue below that the absence of an approved home study should not be considered on this ground.

home and did not err by determining that this finding supported OCS's decision to transfer Amy.[39]

### 4.    Amy's removal from Laura's home

Finally, Laura argues that the superior court's decision was erroneous because it did not consider how OCS's sudden removal of Amy from her home threatened Amy's need for stability and consistency, particularly given her fetal alcohol syndrome diagnosis and history of placement changes.[40]

Removing Amy from Laura's home was almost certainly disruptive, especially after such a long time in her care.  But the combination of Laura's license expiration, the apparent conflict in her home, and the inability to obtain an approved adoption home study were countervailing considerations that justified the transfer.  The existence of conflict in a foster home can also be a reasonable basis for transfer.  And Laura's failure after so many years to complete the steps necessary for adoption meant that Amy's permanent placement remained uncertain.  It was reasonable for OCS to decide that placing Amy in a stable family that seemed capable of quickly finalizing her adoption was better for Amy in the long run.  We do not see an abuse of discretion here.

---

[39]    Laura points out that OCS knew about her divorce throughout the case, arguing this means it was error for the court to rely on her divorce to conclude the transfer was justified.  Although OCS was aware of the divorce from the outset, the aftermath of the divorce impacted the adoption process by delaying a home-study request, resulting in the loss of spousal support, and necessitating certain court records for the foster care license renewal (that Laura never obtained).  It was not error for the superior court to factor the continuing impacts of the divorce into its analysis.

[40]    Laura contends that OCS's limits on post-removal contact between Laura and Amy to a single phone call likely added to Amy's sense of disruption.  But the challenge in this case is to OCS's decision to transfer placement, not the limits it placed on contact with Laura after the transfer, so these limits are not relevant to our analysis.

Laura raises two arguments related to the removal that she did not make before the superior court; we review them both for plain error.[41]  First, she asserts that OCS did not consider that returning Amy to Alaska severed regular face-to-face contact with Georgia and her other blood siblings, pointing to the statutory presumption that maintaining a sibling relationship is in a child's best interests.[42]  But it is not apparent that contact would be significantly more frequent if Amy still lived with Laura because Georgia moved out of the home shortly after Amy's transfer.  Since Amy's transfer, she and Georgia have had video calls and an in-person visit.  And the older sisters had left Laura's home before Amy was placed there.  It was not plain error for the superior court to uphold the transfer in light of its seemingly marginal impact on the sibling relationships.

Second, Laura claims there is no evidence that OCS complied with the statutory requirement to seek input about the benefit of delaying the transfer until the end of Amy's school year.[43]  But the lack of evidence about the team-decision meeting is due in part to Laura's failure to raise this issue during the hearing.  And, as the State points out, Laura's expired foster care license meant it was illegal for Amy to stay in her

---

[41]     *See Kyle S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 309 P.3d 1262, 1267 (Alaska 2013).

[42]     AS 47.10.080(w) ("The court shall recognize a presumption that maintenance of a sibling relationship, including with a sibling who is related by blood, marriage, or adoption through one parent, is in a child's best interest.").  We assume without deciding that this statute applies to blood siblings whose legal relationship has been severed by adoption.

[43]     AS 47.10.080(x) ("In any team-decision meeting the department holds to address the potential or actual transfer of a child from one placement setting to another, the department shall ask the participants for input regarding whether it is in the child's best interest for the child to remain in the child's current school for the remainder of the school term.").

Washington home.[44]  In light of this glaring problem, any failure to consider input about completing the school year in Washington was not plain error.

In sum, the superior court's factual findings are not clearly erroneous, and we see no error in its determination that OCS did not abuse its discretion in transferring Amy to a new placement.

**C.  The Procedural Failures In This Case Do Not Warrant Vacating The Transfer.**

Finally, Laura argues that the superior court should have addressed two procedural failures:  (1) that OCS, the superior court, and the guardian ad litem violated statutory requirements by neglecting to file permanency reports and hold hearings; and (2) that OCS failed to provide statutorily required advance notice of Amy's removal from Laura's home.  Because the court did not consider these failures, Laura argues, we should vacate the transfer.  Laura did not raise these arguments before the superior court, so we review them for plain error.

**1.  Permanency reports and hearings**

Laura argues that the superior court neglected to address OCS's failure to file quarterly reports on its permanency efforts[45] and that it failed to hold a permanency hearing and make required findings.[46]  As a result of these oversights, Laura argues,

---

[44]    *See* AS 47.14.100(e)(3)(c); Wash. Rev. Code § 74.15.040 (2022).

[45]    AS 47.10.080(c)(3) ("[T]he department shall report quarterly to the court and shall demonstrate in its report that the department is making reasonable efforts to find a permanent placement for the child.").

[46]    AS 47.10.080(l) (requiring court to hold permanency hearing within 12 months of a child entering foster care — and every additional year that the child remains in foster care — and "make appropriate written findings" on related issues, including whether OCS has made reasonable efforts to finalize the child's permanency plan).  The
(continued...)

Amy's case "languished" from her placement with Laura in July 2017 until her removal in October 2020, amounting to a failure by OCS to make "reasonable efforts."

Because Laura is challenging OCS's decision to transfer placement, the relevant consideration in this case is not the quality of OCS's efforts to obtain permanency but rather whether the transfer decision was justified.[47] The CINA statutes do not suggest that the appropriate remedy for OCS's failure to follow permanency requirements is to remove Amy from a placement that OCS had determined is in her best interests. The CINA statutes are to be interpreted in a way that promotes the child's best interests;[48] changing Amy's placement solely to punish procedural failures by OCS and the superior court would not advance that goal.

### 2. Notice requirement

Laura also contends that the superior court erred by failing to consider whether OCS violated AS 47.10.080(s)'s provision that the child and foster parent are "entitled to advance notice of a nonemergency transfer." Advance notice, Laura argues, would have permitted her to request a hearing with the possibility of the court denying the transfer before it occurred. OCS did not contend the October 2, 2020 removal was an emergency, Laura argues, so more than a single day of advance notice was required.[49]

---

[46]     (...continued) failure to make permanency findings occurred before the superior court judge who rendered the decision in this appeal took over the case.

[47]     *See* AS 47.10.080(s); CINA Rule 19.1(b).

[48]     CINA Rule 1(c) (providing CINA rules "be construed and applied to promote . . . the best interests of the child").

[49]     An OCS worker testified that OCS did not use Washington social workers for the removal because it was not "an emergency present danger situation."

Reviewing this issue for plain error, we see none. At the time of removal Amy was in an unlicensed out-of-state home, and Laura had been on notice for months that her licensing issue put Amy's placement at risk. OCS also had received reports that Laura's home life had become chaotic. Given these circumstances, we cannot say it was plain error for the court to decline to sua sponte vacate the transfer decision and return Amy to Laura's home because of the short advance notice of transfer.

## V.    CONCLUSION

We AFFIRM the superior court's decision upholding Amy's removal from Laura's home.